PENNSYLVANIA RAILROAD COMPANY ET AL. *v.* LINCOLN TRUST COMPANY, ADMINISTRATOR.

[No. 12,793.   Filed September 13, 1929.   Rehearing denied February 19, 1930.]

30

*Leonard, Rose & Zollars, Louis F. Crosby* and *Guy Colerick,* for appellants.

*Eggeman, Reed & Cleland, Ira M. Snouffer* and *James P. Murphy,* for appellee.

McMAHAN, C. J.—This is an action by the Lincoln Trust Company, administrator of the estate of Herman Bauermeister, against the Pennsylvania Railroad Company and the city of Fort Wayne, to recover damages for the death of said decedent because of the alleged negligence on the part of said defendants in the maintenance of a so-called dual connection or "by-pass" between a system of waterworks of the railroad, maintained by it for its individual use, and the city, in maintaining its system for the purpose of furnishing water to consumers. A demurrer to the complaint was filed by each defendant and overruled. The issues were closed by general denials. Trial by jury resulted in a verdict and judgment against both defendants. The city contends the court erred in overruling its demurrer to the complaint and in overruling its motion for a new trial. The railroad company contends the court erred in overruling its motion for a new trial.

The complaint alleges that the railroad company

owned a water system and pumped water from St. Marys River at a point on its right of way in the city, and conveyed the water to a point east of Anthony Boulevard in the city; that the city owned and maintained a water system, through which it carried water to all parts of the city for sale to consumers at a profit, one of its water mains running north and south in Anthony Boulevard and crossing the railroad right of way; that the city gave the railroad the right, which was exercised, to tap into and intersect the water main of the city at or near Anthony Boulevard; that the railroad, after having so connected its water main, conveyed and commingled raw river water with the water in the main of the city; that said connection was maintained from 1903 until December 29, 1923, during which time the railroad used a system of valves on its property, and that, in connection therewith, the railroad maintained a shut-off or gate valve, which from time to time was opened for the purpose of permitting water from the water mains of the city to flow into the water main of the railroad for the use of the latter at its shops and yards; that, immediately north of the shut-off valve, the railroad maintained a check valve; that when the shut-off valve was open and when the pressure in the main of the city was greater than the pressure in the railroad main, the water from the city main entered and flowed into the railroad main, but that at all times when the pressure in the railroad main was equal to or greater than the pressure in the city main, the river water from the railroad main would be and was forced into the city mains; that the water of the river was saturated with foul and filthy matter, common sewage, typhoid and other deadly bacilli; that sewers from a part of the city in which an epidemic of typhoid fever occurred in August and September, 1923, emptied into the river at a point above the railroad pumping

station, all of which facts were known by both defendants; that the defendants knew that hundreds of citizens purchased water from the Anthony Boulevard main, and they knew that, if the company maintained a pressure greater than the city, the germ-infected water from the river would be carried into the homes of citizens and would be used by them, if the check valves became out of repair; that the said check valve was not a positive check on the river water, and was dangerous to the life and health of persons using water out of said city main; that persons using city water had no way of knowing or determining whether the water furnished by the city was pure and wholesome, and had to rely upon the city, and assume the water was fit for human consumption; that the valve in question had been in use 21 years, was old, worn, unsafe and unfit for use; that the railroad company, in November, and prior and subsequent thereto, negligently opened and permitted the shut-off valve to be and remain open, and permitted the polluted river water to run into the city main, and negligently carried a pressure in excess of the city pressure. After alleging certain other acts of negligence on the part of the railroad, the complaint further alleges that the city negligently permitted the railroad to open the valve and connection between the two water systems, and negligently permitted the polluted and germ-infected river water to be conducted into the city water mains, and to be carried into the homes of citizens of the city, including plaintiff's decedent; that the city negligently permitted the railroad to use an excessive pressure; that the city neglected to keep the check valve in repair and to require the railroad to keep it in repair, thereby negligently permitting the city water to become germ-infected; that the city negligently failed to make proper inspection to see that the valve was kept in repair, or to require the railroad to keep it in repair, knowing it

was out of repair and not water tight, and was unsafe and dangerous to the life and health of consumers of city water; that appellee's decedent, Herman Bauermeister, was a purchaser and consumer of water purchased from the Anthony Boulevard water main, which was carried into his home through connecting mains; that such water was contaminated with typhoid bacilli, which the city knew, and that, by reason of his using such water, appellee's decedent contracted typhoid fever and died from the use of such water.

We agree with counsel for the city that the city is only bound to use reasonable care to see that a reasonably pure and wholesome supply of water is furnished to its patrons, and that, as distributor of a public utility, it is not a guarantor of the purity of the water furnished, nor is it bound to furnish absolutely pure water. And it may be stated as a general rule that there is no duty on the part of a public utility, such as a city, to inspect the devices, apparatus or fixtures of a responsible patron on the patron's property located at a point beyond the meter, which is the point of delivery of the utility. *Fickeisen* v. *Wheeling Electrical Co.* (1910), 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893; *Pressley* v. *Bloomington, etc., Light Co.* (1916), 271 Ill. 622, 111 N. E. 511; *Hoffman* v. *Leavenworth, etc., Power Co.* (1914), 91 Kans. 450, 138 Pac. 632, 50 L. R. A. (N. S.) 574; *Minneapolis General Electric Co.* v. *Cronon* (1908), 166 Fed. 651, 20 L. R. A. (N. S.) 816.

This rule, however, does not apply where the public utility is itself receiving a utility, such as water, through pipes and from a source of supply not owned by the public utility. To illustrate: In the instant case, the city is not being sued because of water which it furnished a patron, and which was delivered by it to the railroad, and which the railroad delivered to one of its employees or patrons, and where the injury or

damage was caused by a defect in the water system of the railroad. The injury complained of in this case is alleged to have been caused by the negligence of the city in allowing the typhoid-infected water to enter into its system and then be distributed to a patron. All of the cases cited by appellant city in support of its contention that the court erred in overruling the city's demurrer are cases where the public utility was delivering a utility, such as electric current or water from its own plant to a customer, and where the injury was caused by a defective fixture or appliance owned by the patron, and, over which, the public utility had no control, and for which it was not responsible. The cases cited are not in point, and are of no controlling influence in the instant case. The city, having permitted the railroad company to connect its water main with the water main of the city, was in duty bound to exercise reasonable care to see that no polluted and impure water, dangerous to health, was allowed to enter into its mains through the water main of the railroad. The quantum of care and vigilance necessary to constitute ordinary prudence has relation to the importance of the subject-matter and is commensurate with the duty to be performed. When a city or other public utility assumes that which is practically an exclusive right, i. e., to provide a community with such a prime necessity of life as water, sound public policy requires that the city faithfully perform its duty by furnishing a supply adequate in quantity and wholesome in quality. From the very nature of things, the consumer must rely on the proffered supply. *Roscoe* v. *City of Everett* (1925), 136 Wash. 295, 239 Pac. 831; *Aronson* v. *City of Everett* (1925), 136 Wash. 312, 239 Pac. 1011; *Workingman's Sav. Bank & Trust Co.* v. *City of Pittsburgh* (1925), 284 Pa. St. 248, 131 Atl. 283; *Hamilton* v. *Madison Water Co.* (1917), 116 Me. 157, 100 Atl. 659; *Hayes* v. *Torrington Water Co.* (1914), 88 Conn. 609, 92 Atl. 406, Ann. Cas.

1918D 853; *Thomas, Admr.,* v. *Maysville Gas Co.* (1900), 108 Ky. 224, 56 S. W. 153, 53 L. R. A. 147. The court did not err in overruling the demurrer to the complaint.

Each appellant contends that the verdict is not sustained by sufficient evidence; that the court erred in admitting certain evidence and in giving certain instructions. Each appellant contends that the court erred in certain particulars not presented by the other appellant.

The first of the contentions common to both appellants is that the verdict is not sustained by sufficient evidence. Concisely stated, the facts as proved are, in substance, as follows: The population of Fort Wayne is more than 100,000; the water supply is procured by the city from rock wells through three pumping stations, and conveyed throughout the city by water mains so connected that any surplus water pumped at any station flows into a reservoir maintained by the city; the water so pumped was connected with the residence of each patron and was intended for human consumption; a 16-inch water main is located in Rudisill Boulevard, an east and west thoroughfare, and furnishes water for the eastern part of the city; other mains are connected with this main, but the one on Anthony Boulevard is the primary one that supplies the patrons in that part of the city; St. Marys River enters the city at the southwest, and runs through the city in a north and then in an easterly direction until it meets the St. Joseph River, thus forming the Maumee River; the sewage and filth of the city are thrown and drained into these rivers; "pumping station three" is in the southwest part of the city on the east side of St. Marys River; the water here pumped is discharged in the main that runs east from the station to Anthony Boulevard; about two miles north of this pumping station, the railroad maintains a pumping station on the west side of the same river, with two pumps of about 1,500,000 gallons capacity each 24 hours.

The water pumped by the railroad at this station flows into cisterns, from which it is pumped into a main that extends along the railroad about two miles, where the water is discharged into a battery of four tubs; from these tubs another main extends east to Anthony Boulevard, a distance of three-fourths of a mile. In 1903, the city gave the railroad written permission to tap the 16-inch main on Anthony Boulevard, and to maintain a connection and "by-pass" between the main of the railroad and the city main; this connection was made; in making this connection, the Anthony Boulevard main was cut and a "T" inserted; an eight-inch pipe was inserted in the "T," and extended east about 50 feet and then south, where the city installed an eight-inch gate-valve, south of which it constructed and laid a wooden box, into which an eight-inch pipe from the city gate-valve entered; the city meter was hung onto this pipe in this wooden box; the railroad attached an eight-inch pipe on the other side of the meter, and a few feet away a swinging check-valve was inserted; an eight-inch pipe extended south, and another gate-valve was installed, and an eight-inch pipe was extended from this last valve and connected with the water main of the railroad; a direct connection between the city supply of water and the railroad's supply of river water was thus made, with the swinging valve and the two gate-valves to prevent the pollution of the city water by the river water; each gate-valve was opened and closed by means of a screw; the closing of either gate-valve closed the pipe and prevented water passing through it; a circular metal disc was inserted in the check-valve and suspended at the top; this disc was so arranged that it automatically closed the valve, its functioning depending on the action of the water; the gate-valves, when opened, allowed the water to enter in front and back of the swinging check-valve, the face of the valve being toward the city main; nor-

mally, the disc would be closed when the pressure in the railroad main was greater than the pressure in the city main; if the city pressure was greater, the valve would open and allow water from the city main to flow into the railroad main; the effective operation of this valve, so as to prevent the pollution of the city water, when the gate-valves were open, depended on the disc being true and in a good state of repair; the proper seating and closing of this valve was of vital importance to the health and safety of the consumers of city water; the pressure in the railroad main was governed by the height of the water in the tubs, and the pressure in the city mains was governed by the height of the water in the city reservoir; the height of the water in the reservoir and in the tubs was indicated by water gauges; during September and October, 1923, the height of the water in the reservoir was less than that in the tubs, thus creating a greater pressure in the railroad main than in the city mains; the southwestern part of Fort Wayne is drained by a sewer which empties into St. Marys River up stream from the railroad pumping station; five streets and the residences thereon empty sewage into this sewer; in July, August and September, 1923, there prevailed in this section of the city and along these five streets many cases of typhoid fever, the bodily excrement of the afflicted being thrown into household toilets or out-door vaults and flushed into the sewer and river. Typhoid fever is an infectious disease, caused by the typhoid germ being taken into the system through the mouth. In November, 1923, there was an explosive epidemic of typhoid fever in the eastern part of Fort Wayne, in the neighborhood served by the Anthony Boulevard water main; from 135 to 140 cases of typhoid existed in that locality and in the immediate vicinity of the "by-pass" and connection between the river water and the city water supply, the first case reported being but a few blocks

from the "by-pass"; an investigation as to the source of the disease was made by the city and state boards of health; the food and milk supply entering the affected area was examined and eliminated as factors, after which attention was turned to the water supply; these investigators, with the superintendent of the city water works, went to the "by-pass" heretofore mentioned; both gate-valves at the "by-pass" were found open, and, so far as disclosed by the evidence, these valves had been open constantly; the swinging check-valve was inspected, and showed the lower surface was "shiny," indicating that abrasive substances had been passing by; it was in such condition as warranted the jury in finding that it was warped, worn, out of repair, and not seating properly; from the "by-pass," the investigators went a short distance to a fire hydrant connected with the Anthony Boulevard main, where several samples of water were taken and found to contain gas formers and colon bacilli, the bacterial count being 2,700 colonies per cubic centimeter; the presence of colon bacilli indicated sewage pollution; the greater bacterial count, the greater the danger from typhoid bacilli; the local board of health caused notices to be published in the local papers, warning the people to boil the water before using it for human consumption; during October and November, 1923, angleworms, weeds, sand, grit, etc., were discharged from the faucets in some of the homes in the affected area; this material did not and could not enter the city water at the source of supply, but entered it after it left the pumping stations; weekly analyses of the water were made at the city pumping stations, and, on each occasion, the water was found to be pure; the medical witnesses testified that in their opinion the epidemic in the eastern part of the city was water-borne; that the germs came from the typhoid patients in the southwest part of the city, through the sewer that emp-

tied into the river, and from there entered the Anthony Boulevard main through the railroad main at the "bypass." The city water was used in every home in the eastern part of the city where typhoid fever existed, and the afflicted persons drank the water; appellee's decedent first complained of not feeling well November 18; he went to bed November 23, and, on December 29, 1923, died as the result of typhoid fever produced from drinking city water taken from the Anthony Boulevard main.

In making this statement of facts, we have considered only the evidence favorable to appellee, and the legitimate inferences to be drawn therefrom.

Appellants contend there is no evidence that the water in the city water mains was infected with typhoid bacilli, or that appellee's decedent contracted the disease as a result of using city water. The source of his disease was purely a question of fact, and, from the nature of the case, the proof must, of necessity, be wholly circumstantial. Direct and positive evidence was not available. The sources from which appellee's decedent procured his various items of food, including milk, were investigated, and eliminated, as there was nothing to show any probability of infection through his food. Appellants make no claim that there is any evidence that the source of his infection was food. We will not extend this opinion by a review of the evidence showing the presence of typhoid bacilli in the water pumped from the river into the water main of the railroad. The evidence conclusively shows this water was so contaminated, and appellants make no claim to the contrary. They call attention to the fact that, in the early part of September, there was a picnic in a public park a few blocks distant from the residence of the deceased, and the affected area; that many thousand people attended this picnic; that the toilet

facilities were inadequate, and that, as a result, much human excrement was deposited on the ground, and suggest the probability that the typhoid germs were carried by flies and thus caused the epidemic in question. The evidence in support of this theory is not very convincing. Whether it was sufficient to sustain that theory is not before us. The jury found it did not and the evidence is sufficient to sustain that finding. The food remaining after the picnic was given to the Orphans' Home in Fort Wayne, where it was consumed by the children, none of whom had typhoid fever. Many of the patients, including Bauermeister, suffering with typhoid, were not at the picnic, and did not eat any of the food or drink any of the beverages served there. Typhoid existed in the eastern part of the city before that picnic was held. The only other source left was the water supply, and the evidence is ample to prove that the epidemic and appellee's decedent's death were caused by water. The decedent used no water except water supplied by the city through the Anthony Boulevard main. The gate-valves on each side of the swinging-valve were open, and the jury was justified in finding that the swinging-valve would not seat, so as to prevent water from the river flowing into the city water main.

The rule as to burden of proof in cases of this class is well stated in *Jones* v. *Mount Holly Water Co.* (1915), 87 N. J. Law 106, 112, 93 Atl. 860, as follows: "The plaintiff was not legally required to prove by positive testimony and with absolute certainty that the drinking of the water was the cause of the typhoid fever. The plaintiff satisfied the burden which the law imposed upon him by proving such facts and circumstances from which it was made to reasonably appear that the drinking of the water was the probable efficient cause of the typhoid fever. *Wilkins* v. *Standard*

*Oil Co.*, 78 N. J. Law 524 (75 Atl. 166). It is only where it appears that the injuries were occasioned by one of two causes, for one of which the defendant is responsible but not for the other, the plaintiff must prove such facts and circumstances as will exclude the equal probability of the injury having resulted from the cause for which the defendant is not liable."

Appellants say that, where one of two or more probable causes may have produced an injury, and it cannot be ascertained from the evidence which of the several probable causes is the cause of the injury, and one of the causes is without the control of the defendant, the defendant cannot be held liable. Relying on this rule, appellants insist it was necessary for appellee to effectually eliminate all causes, other than the use of the city water, from which the disease might have been contracted. If this contention were allowed to prevail without any limitation, a recovery in a case like the present would be impossible. We believe the true rule, when applied to the instant case, is, if two or more possible causes exist, for only one of which a defendant may be liable, and a party injured establishes facts from which it can be said with reasonable certainty that the direct cause of the injury is the one for which the defendant is liable, the party complaining has complied with the rule. *Stubbs* v. *City of Rochester* (1919), 226 N. Y. 516, 124 N. E. 137, 5 A. L. R. 1396; *Tate* v. *Tyzzer* (1921), 208 Mo. App. 290, 234 S. W. 1038; *Gates* v. *Boston, etc., R. Co.* (1926), 255 Mass. 297, 151 N. E. 320. See, also, *Hamilton* v. *Madison Water Co., supra,* and authorities there cited, as to burden of proof.

Actual notice or knowledge of the unwholesome character of the water was not an essential element to be proved in order to establish liability on the part of the city. It was sufficient if there was evidence tending to show that the city, in the exer-

cise of reasonable care, might have discovered the unwholesome and dangerous character of the water. *Jones* v. *Mt. Holly Water Co., supra.*

The connection between the water systems of the railroad and the city, with the two gate-valves and the swinging-valve was made in 1903. The gate-valves were found open when the city and state boards of health made their investigation in the fall of 1923, and there is no evidence that either of them was ever closed. In so far as the instant case is concerned, they might have been omitted entirely. As the conditions existed in 1923, the swinging-valve was the only protection the public had against the polluted typhoid-infected water from the river flowing into the city water main at the point of connection. The jury had a right to believe and find that the railroad and the city knew the gate valves were open all the time, and that, with these valves open, the city and the railroad were negligent in not inspecting the swinging valve, in order to ascertain whether it was seating, so as to prevent the river water from entering the city water supply. Neither the city nor the railroad ever made an investigation or test to see whether the swinging valve was operating effectively. The Supreme Court of this state, in speaking of the duty of a railroad to inspect material purchased and used in the construction of a bridge, said: "The duty of the company is not discharged by trusting, without inspecting and testing, to the reputation of the manufacturers and the external appearance of such materials. The law requires that before the lives of passengers are trusted to the safety of its bridges, the company shall carefully and skilfully test and inspect the materials it uses in such structures. This duty of inspection does not end when the materials are put in place, but continues during their use, for the company is bound to test them from time to time to ascertain whether they are being impaired by

use or exposure to the elements." *Louisville, etc., R. Co.* v. *Snyder* (1889), 117 Ind. 435, 20 N. E. 284, 10 Am. St. 60, 3 L. R. A. 434. The evidence is ample to sustain a finding that both appellants were negligent, and that such negligence was the proximate cause of Bauermeister's death.

Appellants call attention to the testimony relating to the test made of water taken from 18 different homes where there were cases of typhoid fever. Gladys R. Hadley, city bacteriologist, testified that she made the tests, and that the water in 17 showed pure, and one showed gas formers; that she made a further test of the water showing gas formers, and found no colon bacilli. She made no bacteria count. Other witnesses testified that water containing gas formers is suspicious, and all witnesses testifying on the subject agree that water showing a bacterial count of 2,700 per cubic centimeter is unfit for human consumption. We will refer specially to the testimony of but one witness, Henry Lahmeyer, whose daughter had typhoid fever. He testified that his family used city water; that, about November of 1923, he went to get a drink of water, and that, when he turned the water on, it was "filthy and dirty, such as grass and weeds; impossible to drink it; couldn't see through it; poured it back." Another witness testified that she found angle worms, sand and grit in the water. Others testified that it was dirty, roily, and had a bad odor.

It is commonly known that water from a river flowing through cities, towns and thickly populated country is viewed with suspicion. The circumstances in this case were such that the reasonable probability of the river water being infected should have at all times been apparent to watchful minds charged with the protection of public health. Both appellants knew, or should have known, that it was unsafe to allow the polluted water from the river to flow into the water mains of the city.

The situation was such that the contaminated water in the railroad water main might be likened to a firebrand, a spark from which might start a conflagration. Appellants should have been awake to the situation presented with the gate-valve on each side of the "by-pass" open. They knew that, with these valves open, the only thing which would prevent the river water from being forced into the city main was the swinging check-valve, which had never been inspected by either of them after its installation in 1903. As it appears to us, the jury was justified in finding that appellants were, under the facts, negligent in allowing the gate-valves to be and remain open, and in not inspecting the check-valve to see that it was seating and serving the purpose for which it was intended. Ordinary prudence required that the defendants should look to the future and endeavor to avoid possible danger. The situation called for more than inactivity to know that the city water supply at and near the "by-pass" was not contaminated by reason of the river water. Ordinary prudence requires the locking of the door before the horse is stolen. The verdict as to each appellant is sustained by the evidence.

The court gave the jury 59 instructions. Of these, seven were given by the court on its own motion; 13 on request of the city; 17 on request of the railroad, and 22 on request of appellee.

The city and the railroad both contend the court erred in giving appellee's requested instructions 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21 and 22, while the railroad alone complains of instruction 7. These instructions are, in substance, as follows: 2 and 4, along with other instructions, defined negligence; 5 was to the effect that corporations were liable for the acts and omissions of their servants and agents done in the "course" of their employment and in the furtherance of the business of the corporation; 6 told the jury that

the defendants were sued upon the theory of a joint and several liability, and then informed them that, if both defendants owed the decedent a duty to exercise reasonable care, they were jointly bound to perform that duty, and, if they negligently performed or negligently omitted to perform that duty, they were jointly and severally liable if the decedent was without fault; 8 told the jury it was the duty of the city to furnish its patrons water fit for the purposes for which it was intended, and that it could not escape that liability by giving some one else permission to tap its mains, thereby causing the water to become polluted, and that, if it negligently failed to supervise the tap, it could not escape liability because it depended on the party making the tap to keep the tap and connection in a safe condition; 9 charged that actual notice or knowledge of the contamination of the water was not necessary to establish liability of the city; 10, that actual knowledge that the river water was contaminated with typhoid germs, and such water was escaping into the city main, was not necessary to establish liability of the railroad, if, in the exercise of reasonable care, it ought to have known such facts; 11, that it was the duty of the city to furnish a consumer, paying for water in his home, water fit for domestic purposes, and that the city was bound to use reasonable care to furnish reasonably pure and wholesome water; 12, that it was the duty of the city to make reasonable inspection of the mains, pipes and connections, to detect and remedy defects and leaks, and that it was also the duty of the railroad to make such reasonable inspection of its mains and connections as the nature of the same admitted, to detect and remedy any defects; 13, that it was not only the duty of the defendants to make reasonable inspection, but it was also their duty to use that degree of care which reasonably prudent business men engaged in like business

would have used under similar circumstances, and to have, and to procure, and only permit to be installed and used, such appliances as experience had shown to be reasonably safe for the purpose for which they were used, and that every reasonable effort should have been made to adopt and use all proper means readily known to science for the prevention of accidents; 14, that the general charge of negligence included negligence in the appliance and device adopted and used at the "by-pass," and in the maintenance and operation thereof, and that the law required that the city, in selecting and installing, or in permitting others to install, devices, and in permitting their continued use, should use the care that reasonably prudent men similarly engaged would use in such matters; 15, that it was the duty of the railroad to use such appliances as would effectually keep the river water from being forced into the domestic line of the city, and that it was the duty of the city to require the use of such appliances; 16, that actual notice of unwholesomeness of the water was not necessary; sufficient if evidence showed that, by reason of connection of the mains, the water furnished became unwholesome, and that the city, in the exercise of reasonable care, ought to have discovered the unwholesomeness; 17, if the city granted the railroad permission to construct the valve, whereby the river main connected with the city main, it was the duty of both defendants to exercise reasonable care in the construction and maintenance of the connection and valve to prevent any unwholesome water being delivered to customers of the city, the care depending upon the degree of danger, and that, while the defendants were not insurers against impure water, nor required to exercise the highest degree of care, they were required to use such care as a reasonably prudent person would have used under like circumstances; 19, while appellee had the burden of proof, he

was not required to prove by positive testimony and with certainty that the drinking of the water was the cause of the typhoid; he satisfied the burden by proving facts and circumstances from which it was made to reasonably appear that the drinking of the water was the probable efficient cause of the typhoid; 21, one suing for the death of another negligently inflicted is not bound to exclude the possibility that the death might not have happened in some other way than alleged in the complaint; he satisfies the burden of proof imposed by law by proving facts from which it is made to reasonably appear that the drinking of the water was the probable efficient cause of the fever and death; 22 told the jury it was not to consider the pendency of other cases against the defendants in determining their liability, nor the amount of damages in the event of a verdict for the plaintiff.

The seventh instruction, of which the railroad alone complains, was to the effect that the city owed its customers the duty of exercising reasonable care in providing a supply of wholesome water; that, while it was not a guarantor or insurer of its water, or its freedom from infection, it was bound to use reasonable care in learning whether there was a reasonable probability that its water supply might be infected, and, if the exercise of such care would have disclosed a reasonable probability of such infection, it was the duty of the city to adopt whatever approved precautionary measures were reasonably proper to protect its customers. We shall not here enter into a detailed discussion of said instructions and appellants' several and separate objections thereto. If there are any errors in any of these instructions, they are not such as call for a reversal of the judgment.

Instruction 7, requested by the city, was to the effect that the city was not required to inspect, and did not

owe its patrons a duty to inspect, the private apparatus owned and under the control of its patrons beyond the meter where the water is delivered to the patron, if, when the water is turned on, the apparatus of the patron is proper for the purpose for which it is intended. There is no claim that the apparatus on the property of the decedent was not proper. The city's contention that, under the law, it was under no duty to inspect the apparatus used by the railroad in forming the "by-pass" cannot prevail. We have heretofore discussed this question, and will not extend this opinion by again stating the law as we find it to be on this subject. The court did not err in refusing to give this instruction. In addition to the authorities heretofore cited, see *Schoen* v. *Chicago, etc., R. Co.* (1910), 112 Minn. 38, 127 N. W. 433, 45 L. R. A. (N. S.) 841; *Thompson* v. *City of Winona* (1910), 96 Miss. 591, 51 So. 129, Ann. Cas. 1912B 449.

Appellant city contends the court erred in instruction 6, given on its own motion. In this instruction, the court told the jury that actionable negligence, as it related to this cause, was such negligence, if any, as was the proximate cause of Bauermeister's death; that if the jury found the alleged negligence of the city was the sole and proximate cause of his death, its verdict should be against the city, and in favor of the railroad; that if they found the alleged negligence of the railroad was the sole and proximate cause of his death, their verdict should be against the railroad and in favor of the city; that if the alleged negligence of each defendant, combining and concurring, was the proximate cause of such death, their verdict should be against both defendants; and if it had not been proved by a preponderance of the evidence that neither the alleged negligence of the city nor of the railroad, considered separately, or as combined and concurring, was the proximate

cause of such death, their verdict should be for the defendants. The objections to this instruction are: That it defines actionable negligence without regard to whether the act of negligence found by the jury is alleged in the complaint; that it tells the jury that, if they find the alleged negligence of the city was the proximate cause of the death, their verdict should be against the city regardless of contributory negligence; and that they assume the city was negligent. Appellant makes no claim that there is any evidence of any negligence on its part which was not alleged in the complaint to which the jury might have applied this instruction. When this instruction is considered in connection with the general charge of negligence alleged in the complaint, and the other instructions, this objection is not well founded. In so far as the second objection is concerned, there is no claim that there is any evidence tending to show any contributory negligence on the part of Bauermeister. Appellee was not required to prove want of contributory negligence. That was a matter of defense, and, in the absence of any evidence from which an inference of contributory negligence could have been drawn, this objection is not available. Nor is this instruction to be condemned for the reason that it assumes the alleged negligence to have been proved. The jury were told, not once, but many times, that the burden was on appellee to prove negligence as alleged in the complaint, and that it could not recover unless it discharged that burden as to each defendant. No jury could have heard the instructions as given without being thoroughly impressed with the idea that there could be no recovery by the plaintiff unless it proved the negligence alleged in the complaint. The court, by this instruction, limited and confined the jury to the alleged negligence. The jury were told that, if they found from a preponderance of the evidence that the "alleged negligence" was the

proximate cause of the death, appellee was entitled to recover, and that, if they did not so find, they should return a verdict for the defendants. How could the jury have found that the "alleged negligence" was the proximate cause of the death without finding that such negligence had been proved? The giving of this instruction does not call for a reversal of the judgment.

Dr. Gilpin, secretary of the city board of health, over the separate objections of appellants, was permitted to testify that there had been reported to the city board of health typhoid fever cases in the southwest part of the city, in August or September, 1923. He also was allowed to testify that in the early part of November, 1923, cases of typhoid fever were reported to him from the eastern part of the city, and in the territory where appellee's decedent lived. Dr. Underwood, also over objection, testified that he telephoned to the city health board that he had "another" case of typhoid at a certain house in the southwest part of the city. The objection to this testimony was that it was hearsay, and that such notice was given to an officer in the exercise of a governmental function and consequently was no notice to the city. It was the duty of the city to exercise reasonable care in furnishing potable water to its patrons. In order to aid it in the performance of this duty, the local board of health made weekly analyses of the city water at the pumping stations, and reported the results to the water department of the city. These examinations and reports were made for the purpose of aiding the city in the performance of an administrative duty, viz., furnishing water to its patrons for domestic purposes. The secretary of the board of health knew of the existence of typhoid in the southwest part of the city. The existence of the disease in that part of the city was a matter of common knowledge. Knowledge of the municipal health officer was at least

constructive notice to the city. *Roscoe* v. *City of Everett,*
*supra.* The witness had theretofore, without objection,
testified that he had visited at a large number of homes
where typhoid had been reported to the local board of
health. The evidence was proper, and no error was
committed in admitting it.

Dr. Gilpin was present when representatives of the
local board of health and the State Board of Health
inspected the connection between the railroad
main and the city main at Anthony Boulevard,
and testified as to the conditions there at that
time. He told about the removal and inspection of the
swinging check-valve. He testified to the shiny appear-
ance of a part of the face of the valve, and that it was
handed to some one who placed a rule or straightedge
on it. At this point, the witness was asked what the
party who had so placed the straightedge said. The
objection of the railroad to the question was sustained
and the objection of the city was overruled, after which
the witness answered: "He said it would not seat."
The objection of the railroad having been sustained, it
is in no position to complain, and the city makes no
claim that the court erred in this ruling.

The next contention is that the court erred in allowing
Dr. Gilpin to testify what he and Dr. Oilar, one of the
representatives of the State Board of Health, did
when they, with the others, went to the infected
area in the eastern part of the city, when they
were attempting to ascertain the cause of the epidemic.
The objections made were that the investigation was
made after the infection of Bauermeister; was hearsay;
would not prove or disprove any of the issues in the cause
on trial; and was not a part of the *res gestae.* The ob-
jections being overruled, the witness testified that they
visited the meat markets, drug stores, places where ice
cream, pop, etc., were sold, to find the source of infection;

inquired as to where groceries were purchased; and inquired of proprietors as to whether any of their employees were sick; that they made the same kind of an investigation relative to the milk used in that area. He also testified that the number of cases of typhoid reported to him from that area, by representatives of the local health department and physicians, was 135 to 140. Other testimony similar to that of Dr. Gilpin was admitted over the objections of appellants, but we will not prolong this opinion by reviewing and setting out such testimony and the several objections. This evidence was proper for the purpose of eliminating as many of the known methods of typhoid infection as was possible, and is not subject to the objections urged.

Complaint is next made of the admission in evidence of "Exhibit 2," which is a map of the city of Fort Wayne, showing in colors the areas in the southwest and the east parts of the city infected with typhoid fever, and the location of the water main of the railroad from the river to the water tubs and from the water tubs east, the water line being indicated by a large red line, which appellants say is out of proportion to the size of the water main when compared with the river as shown on the map. There is no claim that the map was not correct, that the location of the water line, and the infected areas were not correctly located on the map. This exhibit was properly admitted in evidence.

There is no reversible error in the admission of any of this evidence. Nor was there any error in allowing physicians to testify as expert witnesses that in their opinion the source and cause of the typhoid epidemic in the east part of the city was water. Judgment affirmed.

ON PETITION FOR REHEARING.

McMAHAN, J.—In our statement of the facts relating to the investigation made by the city and state boards of health, we erroneously stated that water taken from a fire hydrant connected with the Anthony Boulevard main was, on examination, found to contain colon bacilli, and that the bacterial count was 2,700 colonies per cubic centimeter. The water containing the colon bacilli and the high bacterial count was taken from a tap in the railroad main in or near the railroad yards. The exact location of this tap is not disclosed, although the inference is that it was near the "by-pass." The fact remains, however, that the water in the railroad main was taken from the typhoid polluted water of St. Marys River, and that there was a direct connection between that main and the water supply of the city. Each appellant stands charged with notice of the character of the water in the river and in the railroad main. At least the jury would have been justified in so finding.

Appellants, in support of their contentions that we erred in holding there was no reversible error in giving appellee's requested instructions, insist that each of said instructions should be set out in full in order that they be not precluded from presenting the correctness thereof upon petition to transfer to the Supreme Court. It is not our purpose to so mold an opinion that the losing party cannot present the correctness of our action to the Supreme Court for review. On the other hand, when we are convinced that no reversible error has been committed, we do not deem it necessary or advisable to unduly prolong an opinion by setting out *in haec verba* all of a series of instructions. The 18 instructions given at the request of appellee cover about 10 pages of appellants' printed brief. If we set

out all of these instructions, it would be necessary to set out some of the other instructions, as the instructions must be considered as a whole. Instructions 2 and 4, defining negligence, are challenged, for the reason that the court did not include therein a definition of actionable negligence, that is, that the court failed to tell the jury that, in order for negligence to be actionable, it must be a proximate cause of the injury. There is no merit in this contention. In instruction 6, given by the court on its own motion, the jury was told that actionable negligence as applied to this case was such negligence, if any, as was "the proximate cause of the death of Bauermeister." This instruction, like instruction 2 given by the court on its own motion, and instructions 3 and 19 given at the request of appellee, and No. 18, given at the request of the city, was more favorable to appellants than they or either of them was entitled to. Technically, each of these instructions was erroneous, in that each of them required appellee to prove that the negligence of which complaint was made was *the* proximate cause of the death of appellee's decedent, when it was necessary that such negligence be only *a* proximate cause of such death. Appellants, however, are not in position to complain of such errors.

It is insisted that instruction 14, given at the request of appellee, is in conflict with instructions 12, 23 and 24, given at the request of the railroad. We hold otherwise. The last three instructions are, in substance, as follows: (12) Unless plaintiff established by a preponderance of the evidence that the valve was defective, the railroad was not obliged to discard it or to cease to use it because it was old or had been in use many years, nor could either defendant be charged with negligence from its continued use merely because of its age or the length of time it had been used; in 23, the jury was told that, if the dual connection was,

when installed, an appliance in general use by careful persons for controlling the flow of water from one system to another, and was by them generally regarded as safe for such purposes and continued to be generally used by careful persons for that purpose from the time of the installation to the time of the sickness of appellee's decedent, the railroad would not be liable because of its failure to install some other method which might have been safer or better; instruction 24 was quite similar to 23, except that it applied to the city and not to the railroad. Instruction 14, of which complaint is made, related to the conduct of the city, so that the railroad cannot complain of the same.

It was not error to tell the jury that the city was required to exercise reasonable care to have and to permit to be used only such devices as experience had shown were reasonably safe for the purpose for which they were used, in view of all the circumstances connected with the business and dangers to be apprehended, and that, in determining whether the city was negligent in this respect, the jury should consider that question in light of all the facts and circumstances in evidence.

Appellants next contend that we did not give sufficient consideration to instruction 15, and, in support of the contention that the court erred in giving this instruction, say that by it the jury was told the defendants were bound to adopt such devices as would effectually keep the river water from being forced into the city mains, and that such was the absolute duty without any regard to the question of negligence. Appellants are in error in this contention. The court, after telling the jury what the duty of the defendants was in this respect, informed the jury that if it found "from a fair preponderance of the evidence that either of the defendants, or both of them, did not exercise ordinary care in the

performance of said duty, and that, by reason thereof,"
Bauermeister contracted typhoid fever and died there-
from, he being without fault, the plaintiff was entitled
to recover. Instructions 18, 19, 21 and 22 are set out
with sufficient fullness to present each objection urged
against them and need no further discussion.

Rehearing denied.