' Mrs. J. T. Gentry *v.* P. L. Hovious *et ux.*\*

and

J. T. Gentry *v.* P. L. Hovious *et ux.*

(*Nashville*, December Term, 1932.)

Opinion filed January 7, 1933.

---

\*On right to recover damages from municipality or water company for injuries resulting from impure water, see annotation in 5 A. L. R., 1402; 13 A. L. R., 1132; 61 A. L. R., 452.

CARMACK COCHRAN, and J. R. L. MOORE, for plaintiff in error.

SETH M. WALKER, and JOHN J. HOOKER, for defendant in error.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

On October 13, 1928, J. T. Gentry rented from P. J. Hovious and wife a dwelling just outside the city limits of Nashville for a period of one year at a monthly rental of $18. There was a cased-in well on the back porch from which water was drawn with a pump. This was the only water on the premises for use by the occupants of said dwelling. The city water was available by piping it from the street into the dwelling. Defendants stated to plaintiffs when the dwelling was rented that said water was pure and wholesome and could be used for drinking purposes with impunity.

On July 26, 1929, Mrs. Gentry became ill with typhoid fever, and was under the care of a physician for a month. She and her husband instituted these suits to recover damages growing out of said illness, the latter suing for loss of services, doctors, nurses and medical bills.

It was alleged in the declarations that said illness was caused from drinking water from said well which was

contaminated with typhoid germs. While there is no direct evidence of this fact, it is the contention of plaintiffs that the circumstances are such that it can be reasonably inferred that this water did contained typhoid germs.

These cases were heard together, and at the conclusion of plaintiffs' proof the trial court sustained the motion of defendants for directed verdicts and dismissed the suits.

The Court of Appeals was of the opinion that the evidence was sufficient to justify a submission of the cases to the jury, and therefore reversed both cases and remanded them for new trials.

These are border line cases, and in view of their importance, the opposing views of the other courts, and in order that the entire court might have the benefit of argument, writs of *certiorari* were granted, and the cases have been very ably presented at the bar by counsel.

There are many ways by which typhoid germs may be taken into the system. According to Mr. Thompson, who testified for plaintiffs, flies are the most favorable carriers of typhoid germs, next water, and third milk. The germ is also taken into the system through eating fruit, fresh vegetables, oysters, ice cream, and some human beings are carriers of typhoid germs.

Gentry's family consisted of himself, his wife, their four-year-old daughter, and a sister and her child. Mrs. Gentry had a three-months-old baby which she was nursing when she contracted typhoid fever. None of these other parties were affected. Mrs. Gentry testified that her husband and daughter had been inoculated for typhoid long before they moved into the Hovious house. Perhaps a year prior to the illness of Mrs. Gentry a

neighbor across the street had a spell of typhoid. The record shows that on this and adjoining places there are open toilets, accessible to flies; and both Mr. and Mrs. Gentry testified that they had flies in their dwelling. Mrs. Gentry also testified that she drank some water when away from home, and that she ate fruit and ice cream.

It is shown without controversy that this water was polluted with colon bacilli germs in August and October 1928, and in August, 1929. Defendants had notice of this fact in the summer and fall of 1928, and were advised by the health department that the water was of a very poor sanitary quality and not considered fit to drink.

With these preliminary statements, we will now quote from the testimony of Mr. Thompson, Sanitary Engineer for Davidson County, as follows:

"Q. I believe you stated that this water that was examined out there contained colon bacilli?

"A. Yes sir.

"Q. Colon bacilli is a group of germs, is it not?

"A. Yes sir.

"Q. That contains some hundreds of various and sundry kinds of germs, is that correct?

"A. I wouldn't say how many.

"Q. You would say at least more than a hundred?

"A. I believe a hundred would be a low limit.

"Q. Isn't it true that a drop of water might be literally saturated with colon bacilli and not have a single germ in it?

"A. That is true.

"Q. You might take it into your system again and again and never have typhoid fever?

"A. Yes sir.

"Q. So you nor anybody else has got any idea or fact, or even speculation as to whether this water had typhoid germs in it? No absolute proof?

"A. No sir.

"Q. And in order to show it has, why they are just guessing about it, isn't that true?

"A. The condition of the water at that time, that is true.

"Q. In other words, to determine whether or not this water at the time in question had typhoid germs in it, is just to make a speculative guess about it, the speculation at this time, because that is as much as you know— isn't that true?

"A. It was contaminated with colon bacilli.

"Q. Mrs. Gentry was drinking that water, and at the same time flies out there from this open toilet and flies from the hog pen next door and at the same time going about in the neighborhood there, people who had previously had typhoid, and you don't know whether they were carriers of typhoid or not, and so the only way you can tell that this woman had typhoid from drinking this water that had colon bacilli in it, is just to conjecture?

"A. I expect that is the best they could do now. . . .

"THE COURT: Mighty near every well water you take around here has this coli bacilli in it, hasn't it?

"A. About eighty per cent of all in Davidson County have shown it. . . .

"Q. Now, Mr. Thompson, in every case where the contraction of typhoid fever has been traced to the water supply, a sample of the water would show colon bacilli, would it not?

"A. Yes sir.

"Q. In other words, you can't have typhoid in water unless colon bacilli are present?

"A. No sir.

"Q. And when you find colon bacilli in water you don't think it necessary to go further to isolate the typhoid germ, do you?

"A. Not that it is not necessary, but it is a very long, tedious and expensive operation.

"Q. And when you get through may be it would still be there, but you would not find it? Often in taking water in which the typhoid germ is present and you find it contains coli bacilli then you take it over and the typhoid germ might still be there, and you wouldn't find it?

"A. Yes sir.

"Q. So when you take a sample of water and find it contains coli bacilli in any character or form that it was contained in two samples taken from this well, you consider this water is unsafe for drinking purposes?

"A. Absolutely."

Dr. Jones, Bacteriologist for the City of Nashville, gave this testimony:

"Q. And upon examination of this water, did you find it to be contaminated?

"A. Yes sir.

"Q. Heavily, or not?

"A. Yes, heavily.

"Q. What was it contaminated with, Doctor?

"A. It had a total bacteria count of 200 organisms per cc—may I explain that the rules of the United States Public Health service required us to make a hundred; then if it contained coli bacilli in as small a count as

that, we went from 10cc and then to 5cc, and it contained coli bacilli, which we considered heavy.

"Q. Is coli. bacilli, is that the family of typhoid bacillus?

"A. Yes, the group containing typhoid and all tropic dysentery.

"Q. I want you to explain about the typhoid bacillus and the relation of the coli bacilli, whether or not it is possible to ordinarily separate typhoid bacilli from the coli bacilli, and if the presence of coli bacilli usually means the presence of typhoid bacilli, and whether or not that would warrant you to presume that typhoid came from coli bacilli where coli bacilli was present in a large number.

"A. That would require a little explanation; it is not practicable as a routine measure to find typhoid bacilli in water, but it has been done for laboratory purposes, but is never done as a routine procedure; but coli bacilli acts as an index of contamination; in other words, if we have coli bacilli in water we know that the water has had fecal contamination; that is, it has been contaminated with bowel contents, and if so, there is a possibility of the typhoid bacilli, of course, in there too, but of course the coli bacilli may exist without the typhoid germ, but we regard that as a dangerous contamination of the water, because of the possibility of the typhoid germ containing the same pathological germs. . . .

"Q. Now, I want to ask you just one more question; it is true, is it not, that practically eighty per cent of the wells and springs and creeks in Davidson County are contaminated with the coli bacilli?

"A. I will not say this for the City of Nashville, but I am safe in this, that close to Nashville around in Davidson County, that is true, some eighty per cent are contaminated.

"Q. About eight out of every ten are that way, is that true?

"A. Yes sir.

"Q. But the fact that they are contaminated with this coli bacilli doesn't necessarily mean that there is typhoid in there?

"A. No sir, but they are potentially dangerous.

"Q. And you can drink water like these people do, eight out of every ten families that use wells, and not have typhoid fever, that is true, isn't it?

"A. Yes sir. . . .

"Q. I beg the pardon of the Court, but I want to ask in this connection about another matter; this well of course has a stream underneath the ground?

"A. Yes sir.

"Q. And that may be absolutely free from contamination by this typhoid germ—so far as it is concerned, one day and then a week or a month from that day, it may be absolutely cloudy with these germs, is that not true?

"A. Yes sir.

"Q. And contaminated one year and another year, or a year from that it may be free from it?

"A. That is true, yes.

"Q. No way in the world to tell when a well is contaminated, or when the water is pure and good?

"A. That's right, contamination will keep up unless something is done to stop it.

"Q. But the use of the water from such a well where

incubation is from seven to fourteen days, that is apt to develop symptoms of it from seven to fourteen days?

"A. Symptoms will develop in that incubation period usually from seven to fourteen days.

"Q. In other words, in October, 1928, it was contaminated with coli bacilli and people drank water out of it during October, November, December, January, February, March and April, why certainly if there was any germ in the water it would be manifested from seven to fourteen days after the water was consumed.

"A. Provided they drank it, yes, if it was going to manifest itself at all.

"Q. Certainly from nine to fourteen days, isn't that true?

"A. Yes.

"Q. Dr. Jones, on that last question, isn't it true that different people, the resistance of different constitutions —it it sometimes greater in some than in others?

"A. Yes, some constitutions have greater resistance.

"Q. Isn't it also true that a person although susceptible to typhoid, could resist it for a time and then develop it? Sometimes in a week, a month, or two or three months?

"A. I don't think so, unless they are continuously drinking the water.

"Q. But if they continue to drink the water?

"A. Perhaps so, they continue to drink the water, and it would catch them sometime when their resistance was low, they might have it then."

It further appears from the evidence that water containing colon bacilli is not considered dangerous solely because of the possibility of the presence of typhoid germs, but because of the possibility of the presence of

other germs that produce different intestinal diseases, as well as other bodily ills.

This suit presents an isolated case of typhoid fever, with knowledge that the patient drank water that was infested with colon bacilli, there being a possibility that this colon bacilli contained typhoid germs. We also have testimony that it is possible that Mrs. Gentry contracted this disease from other sources. In corroboration of the first hypothesis, we have the bare statement of Ed Day that "in the summer of 1928 this house (Hovious) was occupied by Mrs. Deeson, and some one in the family had typhoid fever." This witness does not give any particulars, and does not seem to know who it was that had the fever. He evidently did not see the patient, does not say how long the patient had lived in this dwelling, or that he drank water from the well; and there is no testimony as to the sources of infection to which this party was subjected.

On the other hand, we know that Mrs. Gentry drank this water for nearly ten months before she became ill. The other members of the family drank it without being affected, and it appears that it is possible for her to have become infected from other sources; for example, flies bringing the germs from the open toilets.

In view of all these facts and circumstances, Mr. Thompson says it is a mere guess as to where the germs came from, and this is our impression, after giving the evidence thoughtful consideration. But it is argued that the possibility of the plaintiffs' theory is greater than the opposing theory since it is known that the well water contained colon bacilli, while there is no evidence that the other sources contained these germs. It is, of course, impossible to ascertain whether the other sources were

contaminated. In both cases, however, the theory as to the presence of typhoid germs is based upon a mere possibility which is nothing more than a conjecture or speculation; and upon an examination of the authorities we have found no case holding that in an isolated case of typhoid fever, the mere fact that the patient drank water containing colon bacilli was sufficient evidence to establish the source of the infection. In other words, mere possibility of source of infection, uncorroborated, does not prove the fact.

We will now refer to the cases cited and relied upon by counsel for plaintiffs.

In *Jones* v. *Mount Holly Water Co.*, 87 N. J. L., 106, 93 Atl., 860, it appears that three of plaintiff's children, who had been using water supplied by the defendant company, became ill with typhoid fever in January, 1912. In affirming a judgment against the defendant, the court said:

"There was plenary testimony from which a jury might have reasonably inferred that the water furnished by the defendant company was polluted with fecal matter and other filth and contained germs indicating the presence of typhoid germs in the water. This testimony came from witnesses, who spoke of the polluted condition of the water along the sources of supply of the defendant company in the month of December, 1911, and before the time and prior to the breaking out of the typhoid fever epidemic in Mount Holly in the months of January, February and March, 1912."

*Hamilton* v. *Madison Water Co.*, 116 Me., 157, Ann. Cas., 1918D, 853, is another case of typhoid epidemic where the water came from a stream in which sewerage was emptied. The court, by a process of reasoning based

upon the evidence introduced, showed that every possible source of communication had been eliminated except the water which contained colon bacilli.

In *Hayes* v. *Torrington Water Co.*, 88 Conn., 609, 92 Atl., 406, it appears that in the fall of 1911 an epidemic of typhoid fever broke out in the town of Torrington, and that plaintiff contracted the disease during its continuance. Ninety-seven per cent of the cases of typhoid during the epidemic either lived in the district supplied by the Crystal Lake system or furnished a definite history of having used Crystal Lake water. The laboratory examinations of this water during the epidemic disclosed a persistent appearance of colon bacilli.

In *R. R. Co.* v. *Lincoln Trust Co.* (Ind.), 167 N. E., 721, it appears that an epidemic of typhoid fever occured in Ft. Wayne in August and September, 1923. The city obtained its water from Marys river into which the bowel excrements of the afflicted were flushed. In November, 1923, there was an explosive epidemic of typhoid fever in the neighborhood served by the Anthony Boulevard water main, and this water contained colon bacilli in large quantities.

In *Ritterbusch* v. *Pittsburg* (Cal.), 61 A. L. R., 448, 450-451, the court said:

''There is ample medical and expert evidence in these cases to show that these waters in their thus unpurified condition would be so surcharged with typhoid and other dangerous germs as to render those persons drinking the same liable to attacks of typhoid fever and dysentery as a direct result of its consumption. . . .

''Considering the evidence in each of these cases as a whole, the deduction seems to be inescapable that the epidemic of typhoid fever and dysentery which broke

forth in the city of Pittsburg within the aforesaid period after its agents and officials in charge of its water system had permitted unchlorinated water to be served through its water mains to its inhabitants was directly traceable to that cause, and that the cases of death or illness which form the basis of each of these actions were the direct results of the negligence of the agents and officials of said municipality in the foregoing regard.''

*Roscoe* v. *Everett,* 136 Wash., 295, and *Aronson* v. *Everett,* 136 Wash., 322, were cases of typhoid epidemics in the city of Everett due to the water containing colon bacilli which it furnished to the inhabitants.

In *Wiesner.* v. *Albany,* 229 N. Y. Supp., 622, there was an epidemic of typhoid fever caused by drinking impure water furnished by the city. The court said:

''The presence of colon bacilli in water indicates contamination from human sources. Many types are harmless, in the sense that they do not furnish the origin of disease. The typhoid bacilli (scientifically known as 'B-typhosus') are well recognized cause of typhoid fever. While they are difficult of isolation, they belong to the colon group, and the presence of colon bacilli in water indicates that there is grave danger that the typhoid bacilli are also present, and this becomes a practical certainty where there is an outbreak of typhoid fever, not directly traceable to other sources of infection.''

In *Stubbs* v. *Rochester,* 226 N. Y., 516, 5 A. L. R., 1396, 1402, the Court of Appeals, speaking through Justice Hogan, announced its conclusions in the following language:

''The plaintiff was employed in the immediate locality where the water was contaminated. He drank the water daily. The consumption of contaminated water is a very

frequent cause of typhoid fever. In the locality there were a large number of cases of typhoid fever, and near to sixty individuals who drank the water and had suffered from typhoid fever in that neighborhood appeared as witnesses on behalf of plaintiff. The plaintiff gave evidence of his habits, his home surroundings, and his method of living, and the medical testimony indicated that his illness was caused by drinking contaminated water. Without reiteration of the facts disclosed on the trial, I do not believe that the case on the part of plaintiff was so lacking in proof as matter of law that his complaint should be dismissed. On the contrary, the most favorable inferences deducible for the plaintiff were such as would justify a submission of the facts to a jury as to the reasonable inferences to be drawn therefrom, and a verdict rendered thereon for either party would rest, not in conjecture, but upon reasonable possibilities. . . .

"Cardozo, Pound and Andrews, JJ., concur.

"Hiscock, Ch. J., and Chase and McLaughlin, JJ., dissent."

It will be observed that in each of the foregoing cases the court was dealing with a situation where there was a typhoid epidemic, which, according to the New York Court, makes it almost certain that the water contained typhoid germs.

A case more nearly like the one under consideration than any we have found is that of *Gosser* v. *Ohio Valley Water Co.*, 244 Pa. St., 59, Ann. Cas., 1915c, 685-686. The Supreme Court, speaking through Chief Justice Fell, said:

"The plaintiff's husband was engaged in a business which required him to visit frequently the larger cities

and towns in western Pennsylvania and it was his custom to be from home several days at a time, living at hotels and eating and drinking at various places. He came to his home between nine and eleven o'clock on the night of January 15th, and before retiring was heard to turn the water faucet in his bathroom. About three o'clock the next morning he had bowel trouble. A few hours later, while at breakfast, he was seen to drink water furnished his home through the defendant's mains. His bowels caused him some trouble until February 8th, when his sickness developed into a typical case of typhoid fever, from which he died March 15th.

"The learned trial judge directed a verdict for the defendant and the questions to be considered are; first, whether upon the evidence admitted the plaintiff was entitled to go to the jury and, second, whether evidence was improperly excluded, which if admitted, would have required the submission of the case to the jury. It was shown that the water of the river above the company's pumping station and in its immediate vicinity was contaminated by sewage, but there was no direct testimony that it contains typhoid fever germs, or that there were typhoid fever patients within the water shed from which the company got its supply of water. But assuming that it did contain them, there was no evidence that the deceased drank the water pumped from the river before his illness on the night of January 15th. No one saw him drink it, and the only testimony bearing on the subject was that it was his custom to drink water before retiring and that water was heard running from a faucet when he was in his bathroom. But if the water contained typhoid germs and he drank it before he was taken sick, it would not follow that his sickness resulted

from it. He was constantly absent from his home during the day and frequently at night and of necessity drank water at other places that were supplied with unfiltered river water. It appeared from the plaintiff's testimony that typhoid fever is caused by a specific germ that may be communicated to the human system by water, milk, uncooked vegetables, fruit, uncooked shellfish, direct or indirect contamination and grains of dust in the air, when moist, and that it develops in many cases where it is impossible to define the source of infection. A finding by the jury under the evidence admitted would have been a mere conjecture, based on an inference selected from a number of equally probable inferences.''

We are of the opinion that the cause of Mrs. Gentry's infection is speculative. According to the testimony which she offered, a guess. There is no direct testimony as to the means by which the disease was communicated to Mrs. Gentry, and the circumstances are insufficient upon which to base a reasonable inference that she became infected with typhoid germs by drinking water from this well.

It follows that the judgments of the Court of Appeals will be reversed and those of the trial court affirmed.