BAIR, Respondent, *v.* STRUCK, Appellant.

| 29 | 45 |
| 32 | 93 |

(No. 1,666.)

(Submitted October 12, 1903. Decided November 2, 1903.)

*Animals—Quarantining for Inspection—Dipping Sheep—State Officers — Ministerial Acts — Quasi Judicial Acts — Negligence—Liability—Evidence—Offer of Proof.*

1. Political Code, Section 3034, provides that when the governor, by proclamation, quarantines sheep for inspection, the deputy inspector must immediately inspect the same. Under such section the proclamation was issued, providing that certain sheep imported into the state were liable to convey the disease known as "scab," and ordering that on arrival in the state they should be quarantined and dipped by a deputy sheep inspector in some recognized and reliable dip known to be efficient in the cure of "scab." *Held,* that a deputy sheep inspector, in selecting and using a dip under such proclamation, acted ministerially, and not in a quasi judicial capacity, and was therefore liable for damages arising from negligence.

2. Where, in an action against a deputy sheep inspector for negligently dipping plaintiff's sheep in an improper dip, plaintiff claimed that by reason thereof a large number of the sheep died, and others were so affected that they were worthless for breeding, an offer of proof that other ship were dipped in a similar mixture under like circumstances, and that no "fatal" results ensued, was properly denied.

3.  When an offer of proof as a whole contains objectionable matter, no error
    can be predicated upon the ruling of the court in excluding it.

*Appeal from District Court, Yellowstone County; C. H. Loud, Judge.*

ACTION by Charles M. Bair against Henry Struck. From a judgment in favor of plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

*Mr. James R. Goss,* and *Messrs. Nolan & Loeb,* for Appellant.

The appellant is a public officer charged with the performance of a public duty for the public good. By express provision of law, it was made his duty to determine the proportion and mixture of materials used for dipping purposes. In determining these facts he acted in a quasi-judicial capacity. The proportion of the materials and the character of the materials to be employed in the preparation, depended upon his judgment and discretion. The instrumentalities to be employed were determined by the exercise of his judgment. Acting thus, he did not assume responsibility for negligent conduct. Such responsibility could only attach where he acted intentionally, willfully and corruptly. (Am. & Eng. Ency. of Law, 2d Ed., Vol. 23, p. 76; Shearman & Redfield on Negligence, 5th Ed., Sec. 310; Mechem on Public Officers, Sec. 638; *Fath* v. *Koeppel,* 72 Wis. 293; *Raymond* v. *Fish,* 51 Conn. 80; *Downer* v. *Lent,* 6 Cal. 94; *Elmore* v. *Overton,* 104 Ind. 548; *Ballerino* v. *Mason,* 83 Cal. 447; *Forbes* v. *Board of Health,* 9 So. Rep. 862; *Donahue* v. *Richards,* 38 Me. 379; *Burton* v. *Fulton,* 49 Pa. 155; *Edwards* v. *Ferguson,* 73 Mo. 686; *State* v. *Hastings,* 37 Neb. 96.)

The court erred in excluding the evidence offered. (*Burns* v. *Sennett,* 99 Cal. 363; *Standard Oil Co.* v. *Tierney,* 92 Ky. 367; *Rand* v. *Johns,* 15 S. W. 200; *Bridger* v. *Ashville & S. R. Co.,* 27 S. C. 456; *Calkins* v. *Hartford,* 33 Conn. 57; *Fields* v. *Davis,* 27 Kan. 400; *Dougan* v. *Champlain T. Co.,* 56 N. Y.1.)

*Mr. O. F. Goddard,* and *Mr. M. S. Gunn,* for Respondent.

Merely because a ministerial officer has a discretion to exercise as to the methods and instrumentalities to be employed in the discharge of a duty imperatively imposed upon him by law, he is not possessed of the immunity of a judicial officer. (23 Am. & Eng. Ency. of Law, 2d E'd. p. 377; Mechem on Pub. Officers, Secs. 642, 653, 657, 664, 782; *McCord* v. *High,* 24 Iowa, 336; *Hicks* v. *Dorn,* 42 N. Y. 47; *Hatcher* v. *Dunn,* 66 N. W. 905; *Cubit* v. *O'Dett,* 51 Mich. 347; *Johnston* v. *Dist. of Columbia,* 118 U. S. 19; *Chicago* v. *Scben,* 165 Ill. 371; *Aaron* v. *Broiles,* 64 Texas, 316; *Olmstead* v. *Dennis,* 77 N. Y. 378.)

Whenever a public officer delegated to exercise the police power of the state, through negligence or an error in judgment, exceeds the authority conferred by the statute, and injures or destroys property, he is a naked trespasser and liable to the injured party. (*Pearson* v. *Zehr* (Ill.), 29 N. E. 854; *Miller* v. *Horton* (Mass.), 26 N. E. 100; *People* v. *Board of Health,* 140 N. Y. 1; *Newark, etc. Co.* v. *Hunt* (N. J.), 12 Atl. 697; *Markham* v. *Brown* (Ga.), 92 Am. Dec. 73.)

The evidence offered was not competent. (Greenleaf on Evidence, Sec. 52; *Medsker* v. *Pogue,* 27 N. E. 432; *Atkinson* v. *Transportation Co.,* 31 N. W. 164; *Branch* v. *Libbey,* 57 Am. Rep. 810; *Clark* v. *Willett,* 35 Cal. 534, 544; *Burgess* v. *Ore Co.* (Mass.), 42 N. E. 501; *Lucia* v. *Meech* (Vt.), 34 Atl. 695; *Cleveland, etc. R. Co.* v. *Wynant,* 5 Am. St. Rep. 644; *Hudson* v. *Chicago, etc. R. Co.,* 59 Iowa, 581; *Parker* v. *Portland Pub. Co.,* 69 Me. 173; *Mathews* v. *Cedar Rapids,* 20 Am. St. Rep. 436.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This action was commenced by the plaintiff, Bair, to recover damages from the defendant for injury to personal property. The complaint alleges that in August, 1899, the plaintiff was

the owner of 150 head of Merino bucks, which had lately been imported into this state from the state of Oregon; that the defendant was deputy sheep inspector for Yellowstone county, and as such took the sheep from the possession of the plaintiff, and subjected them to certain quarantine regulations; that none of the sheep were diseased; that the defendant wrongfully and negligently prepared the materials used for dipping the sheep, and put therein carbolic acid or other poisonous matters in such quantities that 69 head of said sheep were killed, and the remaining 81 so badly injured as to render them unfit for breeding purposes, for which they were purchased. The prayer of the complaint was for $2,100 damages.

The defendant admitted in his answer that he was deputy sheep inspector, and that as such he dipped the sheep in question on August 20, 1899, and denied the other material allegations of the complaint. By way of an affirmative defense the defendant alleged that the dipping of the sheep in question was done by him under and by virtue of a quarantine proclamation issued by the governor of Montana on April 15, 1899. The cause was tried to a jury, which returned a verdict in favor of the plaintiff for $1,055.50, and from the judgment entered for the amount of the verdict and costs, and from an order denying the defendant a new trial, these appeals are taken.

In the appellant's brief only two propositions are argued: (1) Does the complaint state a cause of action? And (2) did the court err in excluding a certain offer of proof made by the defendant and in sustaining objections to certain questions asked the defendant?

1. It is earnestly contended that the complaint shows on its face that in the discharge of his duties the defendant acted as a quasi judicial officer, and therefore is not liable for damages arising from his negligence, and would only be liable for such damages as were occasioned by his willful or wanton misconduct, and no such misconduct is alleged. Such portions of the Political Code as are applicable to the facts of this case read as follows:

"Sec. 3034. Whenever the governor, by proclamation, quarantines for inspection as provided in the next section any sheep brought into Montana, the deputy inspector of the county in which such sheep may come, must immediately inspect the same, and if he finds that they are infected with scab, or any other infectious disease, he must cause the same to be held within a certain limit or place in his said county, to be defined by him, until such disease has been eradicated, as provided in the next preceding section.

"Sec. 3035. Whenever the governor has reason to believe that any disease mentioned by this article has become epidemic in certain localities in any other state or territory, or that conditions exist that render sheep likely to convey disease, he must thereupon by proclamation, designate such localities and prohibit the importation from them of any sheep into this state except under such restrictions as he, after consultation with the veterinary surgeon, may deem proper. * * *"

Acting under the authority of these sections, the governor of Montana, on April 15, 1899, issued a proclamation, the pertinent portions of which read as follows: "Whereas, I have reason to believe that conditions exist which render the class of sheep herein designated rams, or bucks, or stock sheep, when brought into this state, liable to convey the disease known as 'scab,' it is hereby ordered that all rams, or bucks, or stock sheep, imported into the state of Montana, from any other state or territory of the United States or foreign countries whatsoever, must when shipped be loaded at point of starting into properly disinfected car or cars, and shipped in such properly disinfected car or cars into this state, where, upon arrival at the state line of Montana, or the closest available point thereto where the sheep are to be unloaded to be driven to destination in the state, and before being turned upon the public domain or upon private premises, and all rams, bucks, or stock sheep driven into or through any portion of this state from any adjoining state or country, avoiding all quarantine yards and areas, shall be held at such point or points as may be hereinafter designated and

there dipped under the supervision of the state vetenarian through the deputy sheep inspector of the county into which the sheep are to remain, and said sheep shall be dipped in some recognized and reliable dip known to be efficient in the cure of scab, twice, the second dip to occur within ten days or between ten and twelve days after the first dipping."

Under the foregoing provisions it was made the duty of the governor to determine what sheep, not themselves diseased, should be quarantined, and to prescribe the quarantine regulations. In doing so he doubtless acted in a quasi judicial capacity, and, having once determined that fact, and having prescribed such regulations in his proclamation, the only duty devolving upon the defendant was to carry such regulations into effect.

But it is contended that under the provisions of the governor's proclamation—"said sheep shall be dipped in some recognized and reliable dip, known to be efficient in the cure of scab" —the defendant was called upon to exercise his judgment and discretion in determining the material to be used and the method of its application, and in this he acted in a quasi judicial capacity. With this contention we cannot agree. The law contemplates that only men who, by their skill and experience, are competent, shall be appointed such deputies, and invested with the duty of carrying into execution this police power of the state. The mere fact that such officers are called upon to exercise some discretion or judgment in selecting materials to be used and the manner of their use does not change the character of their acts from ministerial to judicial or quasi judicial ones. Experience teaches that few, if any, ministerial officers are not called upon to exercise some judgment or discretion in the performance of their official duties. But, if the contention of the appellant be sustained, the distinction between ministerial and quasi judicial acts is practically abolished.

As distinguishing between acts quasi judicial and acts ministerial in their character, the following definitions we think correctly state the law: "Quasi judicial functions are those

which lie midway between the judicial and ministerial ones. The lines separating them from such as are thus on their two sides are necessarily indistinct; but, in general terms, when the law, in words or by implication, commits to any officer the duty of looking into facts, and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial, the function is termed quasi judicial." (Mechem on Public Officers, Sec. 637; Bishop on Non-Contract Law, Secs. 785, 786.)

"Where a power rests in judgment or discretion, so that it is of a judicial nature or character, but does not involve the exercise of the functions of a judge, or is conferred upon an officer other than a judicial officer, the expression used is generally 'quasi judicial.' * * * The officer may not in strictness be a judge; still, if his powers are discretionary, to be exerted or withheld according to his own view of what is necessary and proper, they are in their nature judicial." (Throop on Public Officers, Secs. 533, 534.)

"A ministerial act may perhaps be defined to be one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act done." (Throop on Public Officers, Sec. 537; *Flournoy* v. *City of Jeffersonville,* 17 Ind. 169, 79 Am. Dec. 468; *Pennington* v. *Streight,* 54 Ind. 376.)

"* * * In the same line, a ministerial act has also been defined as an act performed in a prescribed manner, in obedience to the law or the mandate of legal authority, without regard to, or the exercise of, the judgment of the individual upon the propriety of the acts being done." (Mechem on Public Officers, Sec. 657.)

An act is not necessarily taken out of the class styled "ministerial" because the officer performing it is nevertheless vested with a discretion respecting the means or the method to be employed. Such is not the judgment or discretion which is an essential element of judicial action. (*McCord* v. *High,* 24

Iowa, 336; *Grider* v. *Tally,* 77 Ala. 422, 54 Am. Rep. 65; Mechem on Public Officers, Sec. 658; Ency. Law, 2d. Ed. 377.) The same doctrine is announced in *Hicks* v. *Dorn,* 42 N. Y. 47. In this case the plaintiff, Hicks, was the owner of a canal boat, and the defendant was the superintendent of repairs in charge of one section of the Erie canal. Along this canal was a dry dock, into which plaintiff's boat had been taken for repairs. In May, 1865, there was a violent spring rain, which raised the water in the canal to such an extent that in some places it ran over the banks, and it became necessary to open the waste gates connected with the dry dock to let off the surplus water. The captain commenced moving the boat into the canal, and when about half way through the gates in the canal, the water having run rapidly out of that compartment of the dry dock, the boat was left resting upon the sill of the lock gates, about one-half of the boat extending into the canal and the other half into the dry dock. In order to render the canal navigable, it became necessary to move the boat; and several methods for the accomplishment of this purpose were open to the superintendent, one of which was cutting up and removing the boat so as to close the gates, and this method he pursued as the most expeditious for accomplishing his purpose. An action having been brought against him by the owner of the boat, among other defenses set up was that in performing his duties the defendant had acted in a quasi judicial capacity, and could not be held liable except for wanton misconduct on his part.

In disposing of the contention the court said: "It is claimed that the defendant, in determining to remove this boat, and in the removal of it, had a judicial discretion to exercise; and hence that he is not liable, in a civil action, for the manner in which he exercised this discretion. I am unable to see in what sense the defendant, as to this transaction, acted judicially. The law made it his duty to put this canal in repair, and it was not left to his discretion to determine whether he would discharge that duty or not. The law made it an imperative duty, and, if he had neglected to perform it, he would have been liable civilly

for damages sustained by any person from his neglect of duty. In the discharge of this duty, thus imperatively imposed upon him by law, he acted ministerially. It is true that he was bound to exercise his discretion as to the methods and instrumentalities to be employed, and this is true of all ministerial officers; and yet it has never been held that, merely because ministerial officers have a discretion to exercise, that gives them the immunity of judicial officers. In this case, then, the defendant was bound to discharge his ministerial duties in a prudent, careful manner, without infringing upon the rights of private individuals, or unnecessarily injuring them, and for an improper discharge of his duty the law makes him liable to the individual injured."

The question involved in this controversy is not whether the policy adopted was wise, but whether a wrong was done in the details of its execution. We are of the opinion that in the discharge of his duty the defendant acted in a ministerial capacity only.

2. Upon the trial the defendant in his own behalf made the following offer of proof, which, under objection, was excluded: "We desire to show by this witness that no different character of dip is used in which to dip Merino bucks as contradistinguished from ewes or wethers; that the dip in question is a staple in the market for the purposes for which it is used, and is sold in the open market for such purposes, and sold under a certain specific name and brand; that before and after the month of August, 1899, the defendant, as deputy sheep inspector, used the same character of dip, so far as he could tell by brand and selling mark, in which to dip sheep generally; that he used this dip so purchased in proportions such as were used in the instance of the Bair bucks, and that in the admixture of the same with water he substantially did in those other cases as he did in this instance; that the dipping of those other sheep was in the vat in which the bucks in question were dipped; and that no fatal results followed from the dipping of those sheep in substantially the same manner and in the dip made in the same proportions as was used in this instance."

Afterwards the following questions were asked the witness, and objections to them were sustained: "Q. Was the dip that was used in the dipping of Mr. Bair's sheep the same dip as was used in the dipping of those other sheep?" "Q. You may state if the dip and the water used in the dipping of these sheep of Holling's and William Clinton's just prior to the dipping of the Bair sheep were in the same relative proportions."

Consideration of the offer of proof and of the questions referred to may be had together, as they are treated as one error by the appellant in his brief.

The evident purpose of the defendant was to show that he had used the same material, mixed with water in the same proportion, in dipping other sheep as in the case of the dipping of the sheep in question, and that no serious or damaging results had followed. If the offer of proof had fairly presented this matter, it would have been competent. It is contended by the respondent that the offer is fatally defective in many respects; that the offer must show that the dipping was done under like circumstances, with like conditions prevailing as to the character of the sheep, the conditions of the weather, and numerous other conditions to which it is not now necessary to refer.

In our judgment, the offer was fatally defective in one particular at least. Assuming that the questions asked and the offer made fairly show that the other sheep were dipped in the same material, mixed in water in the same proportion, under like circumstances and surroundings, still the offer only seeks to show that in the other instances *fatal* results did not follow. In submitting this offer counsel, in effect, stated to the court that they desired to make this proof, and none other, with reference to that particular subject. The offer is made as a whole. It is not for the court to separate the admissible from the nonadmissible, and admit the one and reject the other. If the offer as a whole contains objectionable matter, no error can be predicated upon the ruling of the court in excluding it. (*Yoder* v. *Reynolds,* 28 Mont. 183, 72 Pac. 417; *Farleigh* v. *Kelley,* 28 Mont. 421, 72 Pac. 756.) The defect in the offer becomes very appar-

ent when we consider the fact that the complaint in this instance alleges that 69 head of sheep were killed, and that the remaining 81 were so materially injured as to render them unfit for breeding purposes. It may be that in the other instances no *fatal* results followed, but that such damage was caused as to render those sheep likewise of no value for the purpose for which they were kept; in other words, the offer is so pregnant with the admission that serious or damaging results may have followed that it could have no evidentiary value, and in its exclusion we cannot say that the court committed error.

The judgment and order denying defendant a new trial are affirmed.

*Affirmed.*

