## CHASE v. INDUSTRIAL COMMISSION et al.

No. 5210. Decided December 22, 1932. (17 P. [2d] 205.)

*J. E. Evans* and *De Vine, Howell & Stine*, all of Ogden, for plaintiff.

*Geo. P. Parker*, Atty. Gen., and *D. M. Draper*, of Salt Lake City, for defendants.

ELIAS HANSEN, J.

Plaintiff is the widow of A. Harris Chase who died from typhoid fever on July 19, 1929. Within a year after her husband's death Mrs. Chase applied to the Industrial Commission of Utah for compensation. She averred in her application that A. Harris Chase died as the result of an accident which arose out of or in the course of his employment by the above named Schramm-Johnson Drugs. A hearing was had before the commission and compensation denied. Mrs. Chase has brought the cause here for review. She seeks to have the order denying compensation annulled. The parties are agreed upon these facts: Schramm-Johnson Drugs is and at all times in question was a corporation subject to the provisions of the Industrial Act of this state. Insurance was carried by the drug company with the Royal Indemnity Company. Some time prior to his death Mr. Chase was employed by the drug company as manager of its fountain in a drug store located in the Eccles Building at Ogden, Utah. He was paid a salary of $150 per month working seven days a week. He became afflicted with typhoid fever, and on June 1, 1929, his condition was such that he was compelled to go to bed where he remained until his death. The commission found, among other facts:

"That during the period of his said employment the deceased drank water from the Ogden City mains at the fountain of said Schramm-Johnson Drugs during his working hours therein, and also drank from the same source, water at his home and other places when not

in the course of his employment. That during the said employment, he served at the lunch counter persons having or having had typhoid fever and by that means came in contact with such persons.

"That the water drunk by deceased, both in the drug store and the other places outside of his employment, was polluted and contained typhoid bacilla, as alleged in applicant's petition, but the deceased was ignorant of such contamination."

As part of its conclusions, the commission found:

"In view of the foregoing facts, the Commission concludes that if the typhoid fever of which the deceased died was contracted from any one of the causes alleged in applicants petition, the inference is just as reasonable that the disease was contracted by drinking such contaminated water outside the course of his employment; that applicant has failed to sustain the burden of proof imposed upon her and for that reason is not entitled to compensation."

It is urged in behalf of plaintiff that the evidence offered and received before the commission was such as to require a finding that the deceased contracted the typhoid fever, from which he died, while in the course of his employment; that the contraction of typhoid fever is an injury by accident within the meaning of the Industrial Act of this state; and that, therefore, the commission was in error in denying compensation. The defendants contend the evidence taken before the commission was not such as to require or permit a finding by the commission that the deceased contracted the disease from which he died while in the course of his employment, and, therefore, the commission properly denied compensation.

The following is a brief summary of the evidence offered on behalf of the plaintiff bearing upon the probable source of the typhoid bacilli which caused the typhoid fever and death of Mr. Chase: Dr. L. L. Daines testified that about the middle of July, 1929, he and Dr. Greaves of the Agricultural College of Logan began an investigation as to the probable cause of the typhoid fever epidemic which had occurred in Ogden during June and July of that year; Mr. Barrett assisted in the investigation; that a thorough ex-

amination was made of the water supply of Ogden city, of various eating houses, and ice cream establishments in Ogden city; that green vegetables which were being sold in Ogden city were also tested for typhoid bacilli; that at the time complained of Ogden city received most of its water supply from artesian wells but some of the water used to supply the city came from Wheeler creek; that the artesian water came from fairly deep sources and was free from contamination; that it is difficult to get up Wheeler Canyon; that a number of families were located near the mouth of Wheeler creek and used water from that source for culinary purposes but none of them contracted typhoid fever during the time of the epidemic in Ogden city; that the water used in Ogden city from Wheeler creek was emptied in a double reservoir; that before it entered the pipe line which supplied Ogden city it ran through the double reservoir; that the tests made of the water from Wheeler creek during the time of the infection showed the absence of bacillus coli from that water supply; that after a careful consideration of the facts connected with the water supply it did not seem likely that the epidemic of typhoid fever came from that source; that all of the persons who became afflicted with typhoid fever during the epidemic, except Mr. Chase, had eaten at one or the other of two eating places in Ogden city; that one of such eating places was a candy kitchen which was very clean and sanitary, that the other eating place was very unsanitary; that the same dairy supplied milk to the two eating places; that the boy who delivered milk to the two places went directly from the one to the other with empty cans; that there was thus a definite connection between the two eating places; that a Miss Brown who worked at the candy kitchen came from California about June 1st; that about June 10th Miss Brown became ill with walking typhoid; that for a time after Miss Brown became ill she waited on people at the candy kitchen; that four persons who had been served at the candy kitchen by Miss Brown (after she showed symptoms of typhoid fever) came down

with typhoid fever in the time usually allowed for incubation; that eight or nine cases of typhoid fever developed in people who frequented the unsanitary eating place. Dr. Daines further testified that:

"We spent a lot of effort in studying out the possibilities, and we came to the conclusion very definitely that the only possible explanation for the typhoid epidemic in Ogden was that it originated in one or both of these eating places. * * * I want to say that contact infection is the most common method of typhoid infection at the present time. Water contamination used to be the most important, considered so. But at the present time water contamination is decidedly less important than food and contact. * * * By contact I mean transfer of the intestinal or urinal discharges of persons who are carriers, and food from a person's hands to his mouth or food from the mouth to the hands, and so on. So there is a definite possibility in my mind that Nondas Brown could have carried that infection over to Schramm-Johnson's Drug Company on her hands. * * * At a medical school out of 100 medical men and doctors they were able to find intestinal discharges on 10% of them. Nondas Brown stated definitely she did not wash her hands every time she used the toilet, and she could have transferred something onto the glassware and in that way Mr. Chase could have picked it up. So Dr. Greaves and I thought we definitely traced all the cases of typhoid in Ogden that summer to these two eating places. * * * I am thoroughly convinced that it (the typhoid fever contracted by Mr. Chase) was not a water infection. I just can't think that it can be explained that way. It does not seem possible to us that it was the general milk distribution. I say that because of the fact that eight or nine of the cases, the adult males contracted it, and they all ate at this restaurant and three or four or five individuals that ate at the other restaurant contracted the disease. We could not help but conclude that Nondas Brown was the greatest probability in the starting of the epidemic. The dates are right, the incubation periods are accounted for, and the fact Nondas Brown went into Schramm-Johnson's time after time, and eliminating the water and the milk and the green vegetables, and so on, it certainly seems to us that was the logical explanation for the Chase case."

At the hearing counsel stipulated that, if Dr. Greaves were called as a witness, his testimony would be substantially the same as that of Dr. Daines. Plaintiff's evidence also shows that Miss Brown and a Mr. Wilson were, on a number of occasions, in the drug store where Mr. Chase

worked when they were suffering from the effect of the early stages of typhoid fever, and that Mr. Chase served them.

Defendants offered in evidence a report of the typhoid epidemic which occurred in Ogden during the early summer of 1929. The report bears date August 8, 1929, and is signed by Dr. T. B. Beatty, state health commissioner. The report was received in evidence without objection. We quote the following from that report:

"The following report of the investigation of the State Board of Health of the recent typhoid outbreak in Ogden is supplemental to the preliminary report submitted July 23rd:—

"Further investigation has furnished evidence which forces the conclusion that the contaminated water from Wheeler Creek, which had been turned into the water system during the month of June, was responsible for the typhoid cases.

"As stated in the preliminary report, the water from Wheeler Creek, an open stream frequented by campers, had been proved by numerous laboratory tests to be dangerously contaminated, and its use for culinary purposes has been condemned by the State Board of Health. The Board did not possess the legal power to compel the purification of the water or the discontinuance of its use until purified, but after long continued effort had in 1928 secured the agreement of City authorities to turn out the Wheeler Creek water from the system until after the installation of chlorination apparatus. Notwithstanding this agreement and the proved impurity of the water, it was turned into the water system during the month of June and was not disconnected until July 6th, after the receipt of a demand from the State Board of Health dated July 5th that such action should be taken. The demand was made upon the discovery that the water supply was grossly contaminated and that Wheeler Creek water was entering the system.

"Cases of sickness began to appear in Ogden following June 10th which were for the first time called to the attention of the State Board of Health July 10th. The sickness proved to be typhoid fever of which fourteen cases were reported resulting in five deaths. The symptoms of the last cases began prior to July 7th, since which date no further cases have been reported in Ogden.

"The weather bureau reports show that on June 10th and June 16th rains had occurred in Wheeler Creek, flushing into the stream surface impurities which might, and may not be stated without reasonable doubt did, include excreta deposited by a typhoid carrier.

The typhoid cases occurred in two series sharply defined and separated, one beginning ten days to two weeks following the first rain the usual incubation period of the disease, and the other a like period following the second rain. There were no cases in Ogden prior to the expiration of the first incubation period and no cases occurred after the incubation period dating from the second rain.

"Under such conditions the presumption that the infection originated in the water supply could only be set aside or controverted by definite and positive proof of some other cause. After a careful investigation and analysis of all possible factors, no evidence in substantiation of such cause has been discovered.

"Any possibility of milk as a cause was immediately ruled out by the fact that different milk supplies were consumed in each case. The alleged theory that the infection was contracted at cerain restaurants can be wholly discarded. Four different restaurants have been mentioned as having been patronized by some of the cases. Others have not eaten at a restaurant. No typhoid carried has been discovered serving food at any of the restaurants. It had been established that no foods that were open to suspicion to typhoid contamination have been dispensed by any of the restaurants.

"It is proper to assume that all of the cases reported had a common origin. The only substance consumed by all of them was the water from the public water supply. Any connection of the disease with the restaurants is further negatived by the fact that although the restaurants had been operating and serving hundreds of people before and after the sudden outbreak, no cases of typhoid were contracted except during the few days covering the presence in the water system of the contaminated Wheeler Creek water, following the rains. Even if such proof of water contamination had not been established as a potential cause of the infection, it is impossible by the utmost stretch of imagination to conceive of circumstances that could suddenly convert the restaurants into typhoid 'depots' on the two separate and brief occasions which would be necessary in order to check with the periods of incubation of the two series of cases. It is to be deplored that on no more evidence than the fact that victims of typhoid had eaten at certain restaurants, the business of the restaurants, according to information received, has been seriously injured by alleged efforts to fix upon them responsibility for the disease. The aim and purpose of an investigation as to the cause of a typhoid outbreak should be solely to establish if possible the facts in order that justice may be rendered to all concerned and to prevent a repetition of the misfortune.

"The possible connection with the disease of contaminated food products from the farming area west of Ogden was carefully studied.

While the use for irrigation purposes in that section of water contaminated with Ogden sewage is an unsafe practice, both to the farmers and to persons consuming vegetables produced under such conditions, a fact which the State Board of Health has repeatedly called to the attention of the City and County officials and the farming community, there is nothing to show that it had any connection with the typhoid situation in Ogden. * * *

"In brief it may be repeated that all possible channels through which the typhoid infection might have been transmitted have been analyzed, and the final conclusion has been reached that the contaminated water supply was the cause of the outbreak."

The evidence further shows that, at the time in question, the plaintiff and her husband used water in their home supplied by Ogden city from its waterworks.

The following cases and authorities are cited and relied on in support of plaintiff's contention that the evidence which we have thus briefly summarized requires an award of compensation: *Great Western Power Co.* v. *Pillsbury*, 171 Cal. 69, 151 P. 1136, L. R. A. 1916A, 281; Honnold on Workmen's Compensation, vol. 1, p. 285; *Brintons, Limited*, v. *Turvey*, [1905] A. C. 230, 2 Ann. Cas. 137; *Chandler* v. *Ind. Com.*, 55 Utah 213, 184 P. 1020, 8 A. L. R. 930; *Vilter Mfg. Co.* v. *Industrial Commission*, 192 Wis. 362, 212 N. W. 641, 57 A. L. R. 627; *Engels Copper Mining Co.* v. *Ind. Acc. Com.*, 183 Cal. 714, 192 P. 845, 11 A. L. R. 785; *City and County of San Francisco* v. *Ind. Acc. Com.*, 183 Cal. 273, 191 P. 26; *Hiers* v. *John A. Hull & Co.*, 178 App. Div. 350, 164 N. Y. S. 767; *Hydrox Chemical Co.* v. *Ind. Com.*, 291 Ill. 579, 126 N. E. 564; *Dove* v. *Alpena Hide & Leather Co.*, 198 Mich. 132, 164 N. W. 253; *Hartford Acc. & Ind. Co.* v. *Ind. Acc. Com.*, 32 Cal. App. 481, 163 P. 225; *Eldridge* v. *Endicott*, 189 App. Div. 53, 177 N. Y. S. 863; *De la Pena* v. *Jackson Stone Co.*, 103 Conn. 93, 130 A. 89; *Fidelity & Casualty Co. of N. Y.* v. *Ind. Acc. Com.*, 84 Cal. App. 506, 258 P. 698; *Scott & H. Lumber Co.* v. *Ind. Com.*, 184 Wis. 278, 199 N. W. 160; *Vennen* v. *New Dells Lumber Co.*, 161 Wis. 370, 154 N. W. 640, L. R. A. 1916A, 273, Ann. Cas.

1918B, 293; *Aetna Life Ins. Co.* v. *Portland Gas & Coke Co.* (C. C. A.) 229 F. 552, L. R. A. 1916D, 1027; *Pinyon Queen Min. Co.* v. *Ind. Com.*, 59 Utah 402, 204 P. 323, 325. Numerous other cases dealing with the question of whether a disease contracted in the course of employment is or is not compensable will be found collected and discussed in vol. 1, chap. 5, Schneider, Workmen's Compensation. In section 256 at page 721 of that chapter the author reviews a number of decisions which involve typhoid fever cases. An examination of the collected cases reveals a conflict of authority as to whether a disease contracted in the course of employment is or is not compensable. Some of the apparent conflict in the decisions disappears when viewed in the light of the various acts under which the decisions were rendered. The question is an open one in this jurisdiction. Our Industrial Act, Laws Utah 1921, chap. 67, pp. 171, 172, § 3112, subd. 5, provides:

"The words 'personal injury by accident arising out of or in the course of employment' shall include an injury caused by the wilful act of a third person directed against an employee because of his employment.

"They shall not include a disease except as it shall result from the injury."

It is by no means clear that the language just quoted permits a construction to the effect that the contraction of typhoid fever is a personal injury by accident within the meaning of our Industrial Act. The words "they [personal injury by accident] shall not include a disease except as it shall result from the injury" would seem to indicate a legislative intent that the contraction of a disease to be compensable must be brought about by some injury other than merely conveying disease germs to the employee. It is not necessary, however, to decide that question in the instant case. The decision of the commission which is brought here for review is silent as to whether or not the contraction of typhoid fever is a personal injury within the meaning of the

150

Industrial Act. We therefore refrain from determining that question.

While a number of cases cited by plaintiff sustain awards of compensation because employees have contracted diseases (other than occupational diseases) such proceed upon the theory that the evidence shows that the disease arose out of or was contracted in the course of employment. In the instant case the commission concluded that the plaintiff had failed to sustain the burden of proving that Mr. Chase contracted typhoid fever while working at the drug store of the defendant Schramm-Johnson Drugs. Before the plaintiff was entitled to recover compensation, the burden of proof was upon her to establish all of the facts necessary to support an award of compensation, including the fact that Mr. Chase died as a result of an injury which he received in the course of his employment. There is a sharp conflict in the testimony as to the probable source of the epidemic of typhoid fever which prevailed in Ogden at the time Mr. Chase contracted that disease. The doctors who testified in behalf of the plaintiff were satisfied that the disease was spread by carriers and that probably Mr. Chase was infected by that means. Dr. Beatty whose report was offered in evidence shows that he was equally positive that the cause of the typhoid epidemic was the water supply of Ogden city. Mr. and Mrs. Chase used the city water in their home. There is a fair inference from the testimony that Mr. Chase there drank of that water. If the city water was contaminated with bacilli of typhoid fever and Mr. Chase drank thereof at his home, he may have contracted the disease which caused his death from that source at his home. In such case plaintiff is not entitled to compensation because of the death of her husband. By a long line of decisions this court has held that findings made by the commission upon conflicting evidence are binding upon this court. Such is the clear mandate of the Industrial Act of this state, Laws Utah 1919, chap. 63, pages 164, 165, § 3148, subds. b and c. The evidence taken

before the commission is not such as to require, as a matter of law, a finding that Mr. Chase died as the result of an accident arising out of or in the course of his employment.

The order denying compensation is affirmed.

CHERRY, C. J., and STRAUP, FOLLAND, and EPHRAIM HANSON, JJ., concur.