## STOKER v. OGDEN CITY.
## McFARLAND v. OGDEN CITY.

Nos. 5347, 5348.  Decided February 25, 1936.  (54 P. [2d] 849.)

390

*D. J. Wilson,* of Ogden, and *Willard Hanson,* of Salt Lake City, for appellants.

*George S. Parker* and *Stuart P. Dobbs,* both of Ogden, for respondent.

FOLLAND, Justice.

Richard T. Stoker and James McFarland died at Ogden City in July, 1929, from typhoid fever. These are actions for damages because of their deaths. Florence K. Stoker, as administratrix of the estate of Richard T. Stoker, deceased, is plaintiff in one case, and James B. McFarland, father of James McFarland, deceased, is plaintiff in the other. In each case it is alleged the disease from which death resulted was caused by the deceased drinking water, contaminated with typhoid germs, furnished by Ogden City through its water system. The cases were combined for purposes of trial and were tried together to a jury. The verdict in each case was for the defendant, no cause of action. Separate appeals were taken by the plaintiffs, but the cases were briefed and argued as one case. Numerous errors are assigned to the instructions given the jury, refusal to give requested instructions, to the admission of evidence, and the refusal to admit offered evidence. Defendant, without cross-appeal, has assigned cross-errors, on which it relies to sustain the judgment in its favor, in the refusal of the trial court to grant its motion for nonsuit and for directed verdict, and to the overruling of its objections to the introduction of certain evidence.

Plaintiffs alleged contamination of the Ogden water supply by the turning into the city mains of the waters of Wheeler creek, alleged to be contaminated, and negligence on the part of the city by the use of Wheeler creek water without sterilization by chlorination or otherwise, after notice that such waters were contaminated and unfit for human consumption. Defendant denied the alleged contamination and negligence.

Two cases have been before this court heretofore on issues arising out of the so-called typhoid epidemic of 1929. Reference is made to the reported decisions for other facts shown therein. *Chase* v. *Industrial Commission*, 81 Utah 141, 17 P. (2d) 205; *Williams* v. *Standard-Examiner Pub. Co.*, 83 Utah 31, 27 P. (2d) 1, 19.

The evidence in the instant cases, which is voluminous, may be summarized as follows: Ogden City is a municipal corporation of approximately 40,000 population. It owns and operates a waterworks system, including sources of supply, by means of which it supplies water for domestic and culinary purposes to its inhabitants. The major portion of supply is taken from artesian wells; the waters from the wells being exceptionally pure and free from contamination. The water is transported through pipes to two distributing reservoirs, and thence into the distributing system of the city. Additional water, when needed, is discharged into the reservoirs from three canyon streams, one of which is known as Wheeler creek, and commingled with the well water before distribution. The demand and supply fluctuate from time to time during the year. Wheeler creek water equals, when used, about one-tenth of the total amount distributed. In 1928 a survey of the water sources was made by a sanitary engineer of the state board of health, who reported that Wheeler Creek water "will be subject to human contamination," and recommended that the supply be chlorinated. At a conference held late in 1928 between the state health commissioner and certain city officials and others, the city officials promised that a chlorination plant would

be installed and the waters of Wheeler creek chlorinated before that supply was again commingled with the other water of the system. The city purchased a chlorinator and contracted for the erection of a building to house the same, but the chlorinator was not used nor the water sterilized until after July 11, 1929.

Evidence adduced by plaintiffs was that Wheeler creek water was turned into the city's system in the latter part of May, 1929, and remained in until July 11th, with the exception of 3 or 4 days about June 16th, when it was turned out on account of a storm. The city's evidence was that Wheeler creek water was turned into the system June 14th, turned out on the 16th, remained out 3 or 4 days, after which it was in again until July 8th, when it was turned out and remained out until after the chlorination plant was installed later in July. The Wheeler creek waters arise from springs in the mountains, flow for about two miles in an open stream through a canyon before being diverted into the city pipe line. There is a beaten trail through the canyon which is often used by picnickers and day campers in the summertime. No toilet facilities were provided and the canyon was not patrolled. A sign near the intake warned against contamination of the culinary water supply. Cattle grazed on the canyon slopes. Mute evidences of possible contamination were melon rinds, cans, papers, and even human and animal excrement along the stream banks. Samples of Wheeler creek water taken in the summer of 1928 and on July 1, 1929, showed presence of coli bacilli. A sample of water taken from city mains July 14, 1929, also showed coli bacilli. A test sample from city mains near the Union Depot taken June 15, 1929, showed negative.

In the latter part of June and early in July, 1929, cases of typhoid fever appeared in Ogden City; 17 suspected cases were testified to. Among them were Richard T. Stoker and James McFarland, both of whom died as a result of the disease, one on the 12th of July and the other on the 13th. Stoker consulted a physician June 26th, and McFarland

about the same time. The average period of incubation after infection by the typhoid germ was testified to be about 10 or 12 days, although it might be as short a period as 6 days or as long as 21 days. The other cases developed at about the same time. One case appeared prior to June 1st, where the probable source of infection was outside of Ogden, and another case of sickness was suspected to be typhoid, but not definitely diagnosed as such. This left 15 known cases in Ogden in June and July.

Defendant introduced evidence tending to show that the water supply was not contaminated. That 5 of the persons contracting the disease had eaten at a certain candy kitchen, and that 8 of the others had frequented, for food, refreshment, or recreation, a certain smokery. That a waitress, a Miss Brown, had been ill early in June, but continued to serve meals at the candy kitchen, her illness later being diagnosed as typhoid fever. One person residing over and frequenting the smokery was not ill, but showed positive reaction to a Widal test for typhoid. It was claimed he was a carrier. The evidence covered the situation rather fully, showing the conditions at these two places, their methods of doing business, the persons patronizing them, and that both places had a common milk supply. The dairy, however, on inspection, was freed from suspicion. No tests were made for coli bacilli in the food or drink served at these places. That summer residents at a resort at the mouth of Wheeler Canyon were supplied with water from Wheeler creek in June and July, 1929, but none were known to be ill.

Many medical experts were called and examined. From their testimony it appears that the typhoid germ is transmitted from an infected person to others either by direct contact or through the medium of food or drink. The germs may leave the infected person by means of sputum, urine, or feces, and may be found in food or drink or on dishes, utensils, clothing, or other things handled by the infected person, or be transmitted by touch or by flies. A frequent source of contamination is where the excrement from sick

persons finds its way through a sewer system into the culinary water supply, or where such excrement is left in open privies or on the open ground and is washed into streams or wells or the bacteria is carried by flies. Where coli bacilli are found in water, "it is a danger sign, and makes one watch for developments that are likely to be serious, and one of these is typhoid fever." Coli bacilli inhabit the intestinal tract of human beings and animals. They are not themselves typhoid germs, but indicate contamination with fecal matter of either human beings or animals. Coli bacilli may exist without the typhoid germ, but, where there are coli bacilli in water, there is danger that typhoid germs may also be present. Such water is regarded as unfit for human consumption, and should be sterilized before being used for domestic purposes. Chlorination is a well-known and inexpensive method of sterilization. Typhiod epidemics frequently have their origin in contaminated water supplies. It seems not to be practical as a routine matter to isolate the typhoid germ in water. It was not done in this case; that is, no typhoid germs were discovered in the Ogden City water.

The condition of the city water in 1928 and 1929 when the contaminated Wheeler creek water was commingled therewith was such as made it a suspected source of typhoid infection. Expert witnesses called by plaintiffs testified it was very probable that the water supply was the source of the typhoid infection and that in their opinion that was the cause of the illness. These answers were made to hypothetical questions which failed to include much of the defendant's evidence. Experts called by defendant in answer to questions which included facts based on defendant's evidence testified that they would exclude the city water as a probable source of the infection, and that it may have come from the candy kitchen or the smokery or both. These opinions were based on the fact that 13 of the persons having typhoid fever had some sort of contact with one or the other

of these two eating houses; that only a comparatively small number of cases developed in a population of 40,000 people using Ogden water; and that the percentage of mortality was comparatively high; that usually in epidemics from water the number of cases was greater and the percentage of mortality low on account of the dilution of infection in the larger supply of water. Where there is direct infection, the masses of typhoid bacteria are greater, resulting in more severe cases.

In order to prevail, plaintiffs had each the burden of proving: (a) That the sickness from which the deceased died was contracted from use of the water furnished by defendant, and (b) that defendant was guilty of negligence in supplying such contaminated water. For purposes of this case, we may dismiss from consideration the question of negligence. That question was submitted to the jury, and there was sufficient evidence to support a verdict of negligence, had such a verdict been found. Wheeler creek water showed contamination with coli bacilli, of which fact the city had ample notice. The experts all agreed that such water was unfit for human consumption without chlorination or other efficient sterilization. At best, the evidence on negligence was in conflict, and that issue was properly submitted to the jury.

Most of the legal questions raised have reference to instructions and evidence respecting the cause of the illness, whether from the city's water or from other sources. It is plaintiffs' contention that Wheeler creek water was shown on test to have coli bacilli in it, which was equivalent to proof that it carried typhoid germs. They say, "B. Coli is the sole test and we must insist upon it." For purposes of this decision we shall assume, without deciding, that the evidence on this point was sufficient to carry the case to the jury, notwithstanding defendant strongly insists the court should have granted either its motion for nonsuit or motion for directed verdict.

Error is assigned to the refusal of the trial court to give plaintiffs' requested instructions Nos. 1 and 2. They are lengthy, and will not be quoted in full. After stating the correct rule as to the burden of proof, the following proposition common to both requests is stated:

"In other words if you believe from the evidence that it is more probable that the decedents contracted typhoid fever from drinking water furnished to them by Ogden City than from any other source * * * you would be justified in returning a verdict for plaintiffs. * * *"

The court instructed the jury that plaintiffs had the burden of proving by a preponderance of the evidence that the "waters of Wheeler Creek bore such contamination as would cause typhoid fever," and that the deceased persons "contracted typhoid fever from drinking said water and died from said fever;" that "by preponderance of the evidence is meant the greater weight of the evidence—that evidence which is the more convincing as to its truth." This is the correct rule on burden of proof. 67 C. J. 1283; 23 C. J. 16; 45 C. J. 1267.

Nowhere in the instructions were plaintiffs held to a higher or more burdensome degree of proof than as stated above. If the alternative language contained in the requested instructions means the same thing, it was not error to refuse it, because the jury was already correctly instructed. If that language means more or less than that plaintiffs must prove their allegations by a fair preponderance of the evidence, then it would be error to give it. What the source of the disease was from which the deceased died is a question of fact. From the very nature of the case, the proof must be circumstantial. Direct and positive evidence was not available. Plaintiffs were not by the court required to establish the source of the infection by direct proof. They furnished the best evidence available. Defendant furnished evidence from which it might be inferred the source was something other than the city water. The burden was not

on defendant to prove by a preponderance of the evidence some other source of infection. From all the facts and circumstances in evidence, the jury were left to determine by reasonable inference whether plaintiffs had proved their allegations by a preponderance of the evidence.

An instruction that the jury "may reach a verdict upon a reasonable probability as established by the evidence" was held bad because "the jury could not be permitted to speculate and base a verdict upon mere probabilities." *Forbes* v. *City of Jamestown,* 212 App. Div. 332, 209 N. Y. S. 99; *Gentry* v. *Hovious,* 165 Tenn. 422, 55 S. W. (2d) 753; *Tremelling* v. *Southern Pac. Co.,* 51 Utah 189, 170 P. 80. The requested instruction would have a tendency to shift the issue the jury should decide to a weighing of mere probabilities. It was not error to refuse to so instruct the jury.

Numerous errors are assigned to the admission of evidence, offered by defendant, tending to show a probable source of the infection at the smokery and candy kitchen through contact or other means because 13 of the persons afflicted with typhoid fever visited or frequented one or the other of these places for meals, refreshments, or recreation. The evidence covered the situation fully by showing conditions at the eating houses, their methods of doing business, the persons patronizing them, the milk supply, and so forth. No tests were made for typhoid or coli bacilli in the food at these places. No doubt it was too late for any useful purpose. The dairy supplying milk to both places was inspected and found free from suspicion. A Miss Brown worked at the candy kitchen as a waitress. She became ill about the 10th of June with what she believed to be a common cold. She "just ached. I would get chills. Some days I would be all right and the next day I wouldn't. I finally became right ill and went to bed on or about July 3rd." During all this time she continued in her employment, with the exception of two or three days. She consulted a physician about June 25th, who told her to treat it as a cold. Her illness was later

diagnosed as typhoid fever. A man who lived over the smokery and frequented it and met some of the people there who contracted typhoid was shown by Widal blood test to have had typhoid, although he was not ill at the time. It was contended he may have been a carrier. The defendant did not claim to be able to show any direct contamination of food or drink, from which typhoid fever might arise, at these places. Other testimony, which will be particularly referred to later in this opinion, tending to show that persons living at a resort below the city's intake in Wheeler Canyon, who used Wheeler creek water for domestic purposes, did not become ill, was also introduced. All this evidence furnished foundation for the hypothetical questions put to the expert witnesses called by defendant. They testified, on the facts stated, that the city water could be eliminated as a probable source of the infection, and they would look for a food or contact infection at one or both of the restaurants mentioned.

Objections were made to all of this evidence on the ground that it was incompetent, irrelevant, and immaterial. It is of the same character as much of plaintiffs' evidence. It is all circumstantial evidence tending to cast light on the problem of the source of the infection, and hence was properly admitted. Its weight and probative effect was for the jury. In cases of this kind involving infection by germs of microscopic size, it is frequently impossible to establish by definite proof the source of the infection. ■ Plaintiffs by circumstantial evidence attempted to prove the illness was caused by drinking the city water, which in 1928 and in July, 1929, was found to be polluted by coli bacilli. There was no direct evidence that it was so contaminated early in June when Stoker and McFarland contracted the disease. There was no showing of typhoid germs in the water at any time. If all other probable sources of the infection are eliminated, a reasonable inference might be drawn that the water caused the illness. The city attempted to show, by circumstantial evidence, that

there were other probable sources of the infection. Neither party was able to show any pre-existing typhoid case from which the germs might have come. This again was left to inference or conjecture. This method of proof usually involves the exclusion, as far as possible, of other probable sources of infection. *Baudenbach* v. *Schwerdtfeger*, 224 App. Div. 314, 230 N. Y. S. 640. In *Pennsylvania R. Co.* v. *Lincoln Trust Co.*, 91 Ind. App. 28, 167 N. E. 721, 730, 170 N. E. 92, the court, in a typhoid infection case, referring to this type of evidence, said:

"The objections made were that the investigation was made after the infection of Bauermeister, it was hearsay, would not prove or disprove any of the issues in the cause on trial, and was not a part of the res gestae. The objections being overruled, the witness testified that they visited the meat markets, drug stores, places where ice cream, pop, etc., were sold, to find the source of infection; inquired as to where groceries were purchased, and inquired of proprietors as to whether any of their employees were sick; that they made the same kind of an investigation relative to the milk used in that area. He also testified that the numbers of cases of typhoid reported to him from that area, by representatives of the local health department and physicians, were 135 to 140. Other testimony similar to that of Dr. Gilpin was admitted over the objections of appellants, but we will not prolong this opinion by reviewing and setting out such testimony and the several objections. This evidence was proper, for the purpose of eliminating as many of the known methods of typhoid infection as was possible, and is not subject to the objections urged."

Plaintiffs were not required by the court to exclude all other possible sources, but the court permitted defendant to introduce evidence tending to show other sources and to reduce the probability of water being the infective agent. Plaintiffs have no ground to complain because the court permitted full investigation of all known facts and circumstances which might be of aid to the jury in arriving at a solution.

Much stress is placed in plaintiffs' brief on the concurring opinion of Mr. Justice Straup in the case of *Williams* v. *Standard-Examiner Pub. Co.*, supra, wherein he states there

is "sufficient positive and direct evidence to justify a finding that the contaminated and polluted waters were the immediate and consequential cause of the epidemic." It is sufficient answer to say that this was merely the expression of opinion by one of the justices only. The opinion of the court does not so hold. While much of the evidence was the same in both cases, the issues were quite different, and there was a wider scope given the evidence in this case. We cannot agree there was direct and positive evidence that the waters caused the illness from which Stoker and McFarland died. There probably was sufficient evidence of a circumstantial character to support a verdict for plaintiffs had the jury so found. The trial court so believed and submitted the cause to the jury. The mere fact that the city waters carried coli bacilli at the time the disease was contracted, if that had been proved, would not necessarily, without considering other facts, be proof that the typhoid germs which caused the disease came from the water. *Gentry* v. *Hovious*, supra; *Wiesner* v. *City of Albany*, 224 App. Div. 239, 229 N. Y. S. 622, affirmed 250 N. Y. 551, 166 N. E. 320.

Error was assigned to the overruling of objections to questions asked several witnesses, and examination of experts based on such testimony, tending to show there was no sickness among the approximately 100 people living during the summer season of 1929 at a hotel and in cottages at the mouth of Wheeler Canyon. The water supply for these people was taken by pipe system direct from Wheeler creek at about the same point as the city's intake. This water was not diluted with other waters nor was it chlorinated. The evidence was at first admitted for the restricted purpose of bearing on negligence of the city, but later admitted on the question of lack of typhoid germs in Wheeler creek water. It was already in evidence that Wheeler creek water was the only suspected water source, in that it showed presence of coli bacilli in the summer of 1928 and in July of 1929, and that it furnished about one-tenth of the city's supply when commingled with the other

city water. Hypothetical questions put to medical experts included the fact of the people at the resort drinking the undiluted Wheeler creek water with no sickness resulting. These facts, in the opinion of some of such witnesses, would take suspicion almost entirely away from the city water and require the discovery of another source of infection. Argument is made that the witnesses were not sufficiently informed to testify to the fact of no sickness at Wheeler creek. One was the owner and manager of the hotel, who lived at the camp all summer taking care of his business. Another was the city health commissioner, who testified from the records in his office. They were competent as witnesses, and any limitation as to their knowledge, disclosed by the evidence, would affect the weight of their testimony rather than its competency. The chief objection argued is that the fact of no sickness at Wheeler creek "could not be pertinent to any issue in that case," that "defendant might as well have called all the other residents of Ogden and shown that they did not get typhoid fever by drinking the Ogden water," and therefore argue that the disease did not come from the water. The evidence was properly admitted.

As we have already indicated, the source of the disease is a question of fact, and from the nature of the case the proof of necessity must be wholly circumstantial. Direct and positive evidence was not available. It is proper to receive evidence of all circumstances which will tend to establish or to disprove the source of the disease. It is not known whether any typhoid germs were in Wheeler creek water. At most, the evidence of the presence of coli bacilli was strongly suspicious. If cases of typhoid fever developed following the drinking of Wheeler creek water by the people at the summer camp, that fact would be relevant and be persuasive that the water carried the dangerous germs; on the other hand, if it be shown that these people drank the water in its undiluted state, and none became ill, that is a circumstance to be taken into consideration, although far from conclusive, tending to prove that the water contained

no typhoid germs. In this kind of case it is necessary to consider many facts and circumstances, more or less directly bearing on the issues, in order to either fix or eliminate suspicion from possible infective agencies.

In an action for death of hogs alleged to have been caused by feeding a certain stock food furnished by defendant, it was held error not to permit defendant to show whether or not the same food sold over a period of years had ever been the cause of the death of hogs feeding on it. *Tracy* v. *Liberty Oil Co.,* 208 Iowa 882, 226 N. W. 178. See, also, *Bair* v. *Struck,* 29 Mont. 45, 74 P. 69, 63 L. R. A. 481; *Mountford* v. *Cunard S. S. Co.,* 202 Mass. 345, 88 N. E. 782; *Epps* v. *State,* 102 Ind. 539, 1 N. E. 491; *Pennsylvania R. Co.* v. *Lincoln Trust Co.,* supra; 1 Wigmore on Evid. (2d. Ed.) 796, 817.

Error is assigned in not permitting the witness L. H. Male to answer the question, "Did you find anything in the source of the milk or cream from which this might arise?" The record discloses no exception taken to the ruling and an apparent abandonment of the particular question. A ruling is not required under these circumstances.

Assignment No. 18 is that the court erred in sustaining an objection to the questions asked the witness Mathers on cross-examination: "And during all of those eight years you worked out there, did you have any epidemics of Typhoid Fever?" He was then asked: "Did you ever hear of any epidemic of Typhoid Fever among the men with whom you worked?" He answered, "No sir," to the last question, but the answer was stricken. Mathers is a man who lived above the smokery in June of 1929, went into the smokery several times a day, and there associated with some of the persons who contracted typhoid fever, including Stoker with whom he shook hands. He testified he had not been ill. A Widal blood test for typhoid showed positive, from which fact it was inferred he was a typhoid carrier. Prior to coming to Ogden, he had worked at Lake Point

on the Southern Pacific Railway for about 8 years, where he associated with about 300 men in camp there. The objection to the first question was properly sustained. He was not an expert in diseases. The record indicates that physicians of experience frequently have difficulty in diagnosing typhoid fever, in the absence of positive tests.

At the trial plaintiffs conceded the objection to the second question was good, but insisted on an answer because defendant had elicited similar testimony regarding the lack of illness of people who drank Wheeler creek water. The purposè was to prove a negative. The difference is that the inquiry directed to the use of Wheeler creek water was pertinent to the very issue in controversy. The question here is as to a matter collateral and remote. The objection as argued goes only to the competency of the witness. A typhoid epidemic is usually of such notoriety that others than experts know of its existence and may testify thereto. It proves nothing, however, that there was no typhoid fever of epidemic proportions resulting in the camp where the witness resided off and on during the previous 8 years. In cases such as this, where the investigation necessarily takes in a wide scope, an answer might well have been permitted. Sustaining of the objection, however, is not such error as would justify a reversal.

Plaintiffs complain of the following hypothetical question, propounded to one of defendant's expert witnesses: "I will put it this way: If you found polluted ■ water going into the system and you found a typhoid epidemic with some fourteen to fifteen cases in a city of forty thousand people; if you find the source of contact common to eight of those people in one place and the source of contact common to five at another, would you consider you had a case of water borne epidemic?"

The objection to the question did not state any grounds or reasons. The only infirmity now urged against it is that no "Source of Contact" was proved or attempted to be proved, but that defendant attempted to impose presumption

on presumption rather than base the question on facts proved. Plaintiffs' argument infers that the phrase "Source of Contact" means source of infection. It is true no source of infection was definitely proved, but only that 8 of the 13 sick people had in some way come in contact at one place and 5 at the other. The language of the question undoubtedly refers to contact and not infection. Defendant produced evidence tending to show such contact by way of patronage of the two places. The objection cannot be sustained on the ground urged. We do not approve the question as a general hypothetical question. It is too restricted in its recital of facts to serve any such purpose. However, it was not intended as such, but only to clarify on redirect some matters developed on cross-examination. A comprehensive hypothetical question had been asked and answered by the witness on direct examination.

Instruction No. 12, which is objected to on the ground it is misleading and erroneous, we think substantially states the law. It is as follows:

"The plaintiffs and the defendant have offered evidence in the support of their respective contentions as to the source of the typhoid and as to the source of its acquisition by the two decedents, which evidence is circumstantial. The plaintiff in each case to be successful with circumstantial evidence must prove certain facts to you by a preponderance of the evidence, from which facts you may naturally and reasonably conclude that his contentions upon the above matters are correct. This conclusion upon your part must not be forced, nor speculative, nor imagined, and must be based solely upon facts proven by a preponderance of the evidence. It must be natural and reasonable under all the circumstances.

"If the evidence offered by the defendant in support of its contention is equally as weighty or is equally as convincing as that of the plaintiff, then the plaintiff has not proved his case by a preponderance of the evidence.

"This does not mean, however, that you must of necessity make a choice between the two contentions. It may be that as a result of your deliberations you conclude that defendant has not proved its contention; even if this be so you are not to render a verdict in favor of the plaintiff unless he has proved his contentions by a preponderance of the evidence."

It is argued that the effect of this instruction is to require plaintiffs to prove their case to almost a moral certainty; that, if defendant by its evidence created any doubt, the jury could not find for plaintiff. The instruction is not susceptible of this construcion, and, when taken with the other instructions as to burden of proof, is a fair statement of the law applicable to the case. It is urged that the only evidence introduced by defendant was based on speculation and not any proven fact. We have already discussed this phase of the case.

From a reading of the record, we conclude the case was fairly tried and the jury adequately instructed as to the law. The judgment of the lower court is affirmed, with costs to defendant.

ELIAS HANSEN, C. J., and EPHRAIM HANSON, MOFFAT, and WOLFE, JJ., concur.